**Russell L. FOSS et al.**

v.

**MAINE TURNPIKE AUTHORITY.**

Supreme Judicial Court of Maine.

Sept. 10, 1973.

Richardson, Hildreth, Tyler & Troubh, by Harrison L. Richardson, Horace A. Hildreth, Jr., Robert E. Noonan, Portland, for plaintiffs.

Preti & Flaherty, by John J. Flaherty, John Paul Erler, Portland, for defendant.

Before DuFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

POMEROY, Justice.

This case comes to us on appeal from the granting of a motion by the defendant to dismiss the complaint in the Superior Court of Cumberland County.

Plaintiffs, whose property abuts the Maine Turnpike in the Town of Gray, allege that the Turnpike Authority's snow removal operations have resulted in runoffs of salt onto their property over a considerable period of time, resulting in the pollution of plaintiffs' water supplies, defoliation of their crops, destruction of their plumbing and assorted other damage both to property and person. Additionally, plaintiffs contend that the salting was excessive, and that it was carried out by the Authority with knowledge of, and disregard for, its damaging effects on plaintiffs' property.

The Superior Court dismissed plaintiffs' count III, asking exemplary damages, on the ground that such damages could not be assessed against a municipal corporation or state agency, such as the Turnpike Authority, without statutory authorization. Subsequently, the Court dismissed plaintiffs' remaining counts, labeled *"count in nuisance," "count in negligence," "count in trespass,"* and *"count for an injunction"* on the theory that sovereign immunity precluded such suit against the Turnpke Authority.

We sustain the dismissal of Count III.

We reverse the dismissal of counts I, II, IV and V.

In dismissing plaintiffs' counts labeled *"negligence," "nuisance"* and *"trespass,"* and the count for an injunction, the Superior Court cited our decision in Nelson v. Maine Turnpike Authority, 157 Me. 174, 170 A.2d 687 (1961), noting that *Nelson* was *"nearly analogous in some respects to the case at bar."*

*Nelson* involved negligent highway maintenance which allegedly resulted in personal injury to a turnpike user. In upholding dismissal of the complaint in *Nelson,* we noted the controversy which surrounds the doctrine of sovereign immunity, but held that the Turnpike Authority was, in fact, a body *"performing a governmental function,"* and as such was endowed with the same sovereign immunity protection which was enjoyed by municipal corporations and other governmental agencies in Maine.

Plaintiffs now ask us to overrule *Nelson* and to declare that the Turnpike Authority does not possess sovereign immunity. Al-

ternatively, plaintiffs ask us to hold that their cause is actionable under certain *"exceptions"* to the sovereign immunity doctrine.

Since we agree with plaintiffs' alternative suggestion, we find no need to consider overruling *Nelson* at this time.

The doctrine of sovereign immunity is frequently assumed to preclude all liability in tort for governmental agencies. But this blanket expression of the doctrine goes far beyond its traditional application. Consequently, it is vital that the limitations of the doctrine be understood.

■ Among these limitations are those arising out of situations in which a municipality or governmental agency has either physically invaded private property or has performed acts not authorized by law which have impaired the use and enjoyment of that property. Traditionally, such acts of invasion or impairment have been labeled as *"trespasses"* or *"nuisances,"* depending on the particular pleading purposes to be served.

With the abolition of common law pleading, the necessity of *"labeling"* disappeared. The practice of labeling continued, however, with results that have frequently been more confusing than illuminating. Uncertainty over what constitutes a *"nuisance"* or a *"trespass"* or *"negligence"* often blurred the basic question of whether the particular facts of a case were such as to authorize judicial relief, under whatever label one chose to append to the pleadings.

As Professor Prosser explains in his treatise on Torts:

"Another fertile source of confusion is the fact that nuisance is a field of tort liability rather than a type of tortious conduct. It has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion. The attempt frequently made to distinguish between nuisance and negligence, for example, is based upon an entirely mistaken emphasis upon what the defendant has done rather than the result which has followed, and forgets completely the well established fact that negligence is merely one type of conduct which may give rise to a nuisance . . . . Today liability for nuisance may rest upon an intentional invasion of the plaintiff's interests, or a negligent one . . . . " Prosser—Law of Torts, 4th Edition, pp. 573–574 (1971).

In summary, our task in dealing with a case such as that now before us is not to test the sufficiency of the labels employed to describe the act complained of, but to determine, based upon the factual allegations, whether or not an interest of plaintiffs has been impaired or injured in such a way as to justify the granting of legal relief.

■ As we have noted above, the defense of sovereign immunity has not generally been held to cover situations of legally unauthorized physical invasion of property or of serious impairment of property use and enjoyment. In simplest terms, it may be said that a municipality has no more right to bring about such consequences than has a private citizen. District of Columbia v. Totten, 55 App.D.C. 312, 5 F.2d 374 (1925), cert. denied, 269 U.S. 562, 46 S.Ct. 21, 70 L.Ed. 412 (1925); Franklin Wharf Company v. City of Portland, 67 Me. 46 (1877); Cumberland and Oxford Canal Corp v. City of Portland, 62 Me. 504 (1871).

■ Municipal liability for such consequences is limited, however, by one important qualification; namely, that acts of a municipality or governmental agency which have been authorized in some manner by the Legislature are not actionable in the same manner as acts of private parties, so long as they are carried out in a reasonable and non-excessive fashion. In other words, it may be said that the Legislature has the power to authorize what otherwise

would be traditionally categorizable as *"nuisances"* and *"trespasses,"* and that if the municipality thereafter carries out the acts in the manner contemplated by the legislative authorization, recovery such as would be possible against a private party would be barred.

In Transportation Company v. Chicago, 99 U.S. 635, 25 L.Ed. 336 (1878), the United States Supreme Court dealt with an allegation of *"trespass"* and *"nuisance"* brought by a transport company against the City of Chicago for obstruction of wharf facilities caused by the construction of a legislatively-authorized coffer dam. Finding the obstruction to be non-actionable as *"trespass"* or *"nuisance,"* the Court stated:

> "A legislature may and often does authorize and direct acts to be done which are harmful to individuals, and which without the authority would be nuisances; but in such a case, if the statute be such as the legislature has power to pass, the acts are lawful, and are not nuisances, unless the power has been exceeded." 99 U.S. at 640.

As indicated earlier, however, the doctrine that legislatively authorized acts cannot be treated as *"nuisances"* or *"trespasses"* is itself limited by the stipulation that such acts must not only be legislatively authorized but also performed in such a fashion as the Legislature would reasonably have anticipated.

In Tuell v. Marion, 110 Me. 460, 86 A. 980 (1913), for example, this Court dealt with a bridge, constructed by the Town of Marion, which obstructed a navigable stream. We noted that:

> "Even when a town is authorized by the Legislature to erect a bridge across navigable waters, unless it is constructed as authorized by the act in a reasonable and proper manner, and it is an obstruction to navigation, the town is liable. The legislative authority . . . contemplates its being done in a reasonable

manner, and . . . damages that result or a careless or unreasonable exercise of their power, are not treated as having been contemplated by the act conferring the authority." 110 Me. at 463, 86 A. at 981.

Similarly, in Franklin Wharf Company v. City of Portland, 67 Me. 46 (1877), we dealt with a legislatively-authorized sewer project which had resulted in complete obstruction of plaintiffs' wharves. In *Franklin* we stated that:

> "The purpose of the statute under which the city acted was not to authorize it to transfer a nuisance from the city to low water mark, or to create one there, but to enable it to conduct the rubbish and impurities . . . to a point in the sea where they would ordinarily be so distributed and dissipated as not to create a nuisance . . . it is a right to make deposits temporarily, and not a right to obstruct navigation permanently." 67 Me. at 56–57.

In short, these cases indicate that it is not enough that an activity be authorized by the Legislature for full liability to be precluded, but rather that there is an additional requirement that the acts actually be carried out in a limited, reasonable manner, as anticipated in the initial legislative authorization.

Applying these rules to the instant case, the issues of nuisance and trespass become clear.

■ To the extent that the salting operation of the Turnpike Authority was not authorized, or was carried out in an unreasonable or excessive fashion, then the Authority is wholly stripped of the protection of the immunity doctrine, and the salt runoff is to be treated as any other invasion of property or interference with the use and enjoyment of such property.

■ Assuming *arguendo* that the salting operations of the defendant were both authorized and reasonable and, hence, that

such operations cannot be treated as a *"nuisance"* or *"trespass,"* there is yet one avenue of compensation still open to the plaintiff, for while it is true that the Legislature may authorize that which otherwise would be a *"nuisance"* or *"trespass,"* it is equally true that the Fifth Amendment of the United States Constitution[1] prohibits the *"taking"* of property for public use without *"just compensation."*

Accordingly, if it is found that the injury to plaintiffs' property is sufficient to constitute a *"taking"* of that property in the constitutional sense, it follows that *"just compensation"* must be paid, even though that activity could not be labeled a *"trespass"* or *"nuisance"* in the ordinary sense. Kennebunk et al. Water District v. Maine Turnpike Authority, 145 Me. 35, 71 A.2d 520 (1950); Hamor v. Bar Harbor Water Company, 78 Me. 127, 3 A. 40 (1886).

■ In order to constitute a constitutional *"taking,"* it is not necessary that the plaintiff actually be removed from his property or deprived of its possession, but merely that an interest in the property, or in its use and enjoyment, be seriously impaired.

In United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), the Supreme Court dealt with a government dam which had partially inundated private property, noting that:

"property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." 331 U.S. at 748, 67 S. Ct. at 1385.

Similarly, in State v. Johnson, Me., 265 A.2d 711, 715 (1970), this Court stated that:

"Broadly speaking, deprivation of property contrary to constitutional guar-
anty occurs 'if it deprives an owner of one of its essential attributes, destroys its value, restricts or interrupts its common necessary, or profitable use, hampers the owner in the application of it to the purposes of trade, or imposes conditions upon the right to hold or use it and thereby seriously impairs its value.' "

■ In short, therefore, even if the snow removal operations of defendant Turnpike Authority are found not to be a trespass or a nuisance, the plaintiffs would still be entitled to *"just compensation"* if their use and enjoyment of their property has been sufficiently injured as to constitute a *"taking"* in the constitutional sense. In such a case, damages would be governed by the rules usually applied to *"takings"* in Eminent Domain, namely, the diminution of the *"market value"* of plaintiff's property resulting from the *"taking."* Gilmore v. Central Maine Power Company, 127 Me. 522, 145 A. 137 (1929).

In summary, we may say that there are two conditions under which plaintiffs would be entitled to damages.

The first condition would exist if plaintiffs' property had been injured by an act of defendant that was either legislatively unauthorized or performed in an unreasonable or excessive manner. In such a situation, the activity must be treated in the same manner as if private parties only were involved. Moreover, in such a situation injunctive relief might be made available to plaintiffs to the extent that the salting was unauthorized or excessive.

The second condition, alternatively, would exist if plaintiffs' property had been injured by an act of defendant that was both authorized and reasonably performed, but which resulted in a constitutional *"taking"* of the property. In such a situation, plaintiffs would be entitled to the same damages as would be available to them in a proceeding in Eminent Domain. Equitable relief, moreover, would not be avail-

---

1. See also: Article I, Sec. 21, Constitution of Maine.

able, the Constitution requiring merely "just compensation."

In light of the above, it is clear that the dismissal of plaintiffs' counts labeled *"trespass"* and *"nuisance"* was incorrect, and must be reversed.

We also reverse the dismissal of plaintiffs' count labeled *"negligence."*

As we have noted, invasions of private property and impairments of the use of such property which have been caused by a governmental agency traditionally have been actionable at common law, despite the sovereign immunity doctrine. Accordingly, it would be little more than an exercise in semantics, when confronted with such consequences which have been negligently caused to hold that a count in *"nuisance"* is actionable while dismissing a count in *"negligence"* arising from the very same set of facts. As Justice Cardozo stated in McFarlane v. City of Niagara Falls, *247 N.Y. 340, 160 N.E. 391 (1928)*:

> "There has been forgetfulness at times that the forms of action have been abolished, and that liability is dependent upon the facts and not upon the name . . . It would be intolerable if the choice of a name were to condition liability." 247 N.Y. at 344–345, 160 N.E. 392.

In *Nelson*, this Court upheld "the policy of immunity from liability for tort *under the circumstances before us* . . ." 157 Me. at 186, 170 A.2d at 693. Those circumstances did not involve negligence which had resulted in a physical invasion of property or an impairment of property rights, but merely *"negligence"* alone. Because of this major distinction, we reach the result in the instant case without the necessity of reconsidering *Nelson* at this time.

We turn to the dismissal of plaintiffs' claim for exemplary damages.

■ Exemplary, or punitive, damages are generally awarded in those cases where the conduct of the defendant is found to be deliberate, malicious or grossly negligent. Such damages are awarded to plaintiff over and above compensation for his injuries.

Traditionally, three rationales have been suggested in support of exemplary damages.

First, it is argued that such damages help to punish the defendant for his misdeeds.

Second, it is contended that such damages help to deter future misconduct of a similar nature by the defendant and by others.

Third, it is suggested that exemplary damages serve a remedial function by *"compensating"* plaintiff for such intangible factors as aggravation and mental anguish as well as for such tangible costs as those of litigation.

The first of these rationales, that of punishment, has been rejected in Maine. In Allen v. Rossi, 128 Me. 201, 146 A. 692 (1929), for example, we distinguished between exemplary damages and fines, noting that:

> "A fine is imposed on a person for a past violation of law, while punitive damages have reference rather to the future than to the past conduct of the offender, as an admonition to him not to repeat the offense, and to deter others from the commission of like offenses." 128 Me. at 205, 146 A. at 694.

As *Allen* demonstrates, this Court has recognized deterrence as a proper justification—in fact, *the* proper justification—for exemplary damages.

■ Recognizing this, it is clear why such damages are not allowable, as a matter of public policy, against municipal corporations and government agencies, absent statutory provisions to the contrary. For when exemplary damages are exacted from a governmental agency, the penalty is in-

flicted not upon the wrongdoer, the agent, but upon the public itself. Accordingly, not only are innocent parties paying the price, but the deterrent function of exemplary damages is wholly negated.

> "The most telling argument against the assessment of damages against a municipal corporation is, in our view, the fact that it penalizes the public in order to accomplish nothing. Can it be said that those responsible for the conduct of public business will be either more able or more likely to punish the actual wrongdoers because the verdict is more than necessary to compensate an injured person?" Fisher v. City of Miami, 160 So.2d 57 (Fla.App.1964).

We believe that the answer to this question is clearly in the negative.

In Michaud v. City of Bangor, 160 Me. 285, 203 A.2d 687 (1964), this Court upheld statutory provisions for double and treble damages imposed on a municipal corporation. In doing so we took express notice of the fact that "punitive or exemplary damages, according to the weight of authority, are not recoverable against a municipality unless expressly authorized by statute." 160 Me. at 288, 203 A.2d at 689.

As against these potent considerations of public policy, we are left only with plaintiffs' contention that exemplary damages might somehow have a remedial effect in defraying legal costs and compensating plaintiffs for such intangibles as mental suffering.

We do not believe that such remedial considerations can in any sense outweigh the public policy arguments against exemplary damages.

The entry must be,

Appeal denied as to dismissal of count III of plaintiffs' complaint. Appeal sustained as to dismissal of counts I, II, IV and V.

WEBBER, J., sat at argument but retired before this opinion was adopted.