MARY L. ALBAHARY ET AL. *v.* CITY OF BRISTOL
(SC 17265)
(SC 17266)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 23—officially released December 20, 2005

*Michael A. Zizka*, for the appellants in Docket No. SC 17265, appellees in Docket No. SC 17266 (plaintiffs).

*Ben M. Krowicki*, with whom were *Susan Kim* and *Brian R. Hole*, for the appellee in Docket No. SC 17265, appellant in Docket No. SC 17266 (defendant).

*Opinion*

SULLIVAN, C. J. These certified appeals arise out of an action brought by the plaintiffs,[1] the owners of a certain property located in the town of Southington, against the defendant, the city of Bristol, challenging the statement of compensation filed by the defendant in connection with its taking by condemnation of certain interests in the plaintiffs' property. Before they brought this action, the plaintiffs had brought an action against the defendant in the United Stated District Court for the District of Connecticut (federal court) raising numerous statutory claims, common-law claims and a claim of inverse condemnation, all pertaining to the defendant's maintenance of a landfill abutting their property which, the plaintiffs alleged, had contaminated the groundwater under their property. The federal court found for the plaintiffs on most of their statutory and common-law claims but denied the plaintiffs' inverse condemnation claim. Subsequently, the trial court in the present case rejected the plaintiffs' claim that the valuation of the property interests taken by the defendant should be measured by comparing the value of the land in its uncontaminated state to the value of the land in its contaminated state on the ground that the federal court previously had decided that issue in favor of the defen-

---

[1] The plaintiffs are Mary L. Albahary, Patricia N. Gilbertson, J. Harwood Norton, Jr., Nancy S. Norton, Janet N. Sonstroem, Dawn B. Norton, Norton-Lazenby, LLC, and Irving H. Norton.

dant. The plaintiffs appealed to the Appellate Court, which concluded that although the plaintiffs had a right, in principle, to be compensated in this condemnation proceeding for the pretaking contamination of their property, the trial court properly had concluded that, under the circumstances of this case, the plaintiffs were barred by principles of collateral estoppel from making such a claim. *Albahary* v. *Bristol*, 84 Conn. App. 329, 337–41, 853 A.2d 577 (2004). We subsequently granted the defendant's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that in the measurement of the plaintiffs' just compensation, the plaintiffs had a right to be compensated for the totality of the damage caused to their property by the defendant's contamination of the plaintiffs' groundwater?" *Albahary* v. *Bristol*, 271 Conn. 924, 859 A.2d 576 (2004). We also granted the plaintiffs' petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the doctrine of collateral estoppel, or issue preclusion, precluded the plaintiffs from obtaining compensation from the defendant for damages arising out of the defendant's pretaking contamination of the plaintiffs' groundwater?" *Albahary* v. *Bristol*, 271 Conn. 925, 859 A.2d 576 (2004). We affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts and procedural history. "The plaintiffs are joint owners of 87.6 acres of unimproved property in Southington. The property, which is almost entirely in a residential zone, is taxed as open space land. Its northerly part, which abuts [a landfill operated by the defendant], consists of approximately forty-six acres that, since 1992, have been used for the mining of good quality sand and gravel. Its southerly part, approximately forty-two acres, consists of unimproved land.

"The defendant's abutting landfill was operational from 1946 to 1997, when it was closed down by the state department of environmental protection (department) because of contaminating leachate generated at the site. The leachate polluted the groundwater on the plaintiffs' property so that it is not potable.

"On October 24, 1995, the department and the defendant entered into a consent order in which the defendant conceded that '[t]he operation of a solid waste disposal area at the [landfill resulted] in a discharge of water, substance or materials, including but not limited to leachate, into the waters of the State.' The consent order required the defendant to undertake certain investigations and studies with regard to the landfill and to propose plans in order to remediate the leachate contamination that the landfill had caused. The consent order did not require the defendant to clean up the contamination. Instead, it gave the defendant the option to acquire control over all of the polluted groundwater rights or interests therein that were located within a certain 'zone of influence' that included the property of the plaintiffs.

"In 1996, the legislature enacted No. 96-12 of the 1996 Special Acts, to permit the defendant to acquire or to condemn property outside of its borders. This special act was intended to enable the defendant to comply with the consent order.

"On July 30, 1997, relying on the special act, the defendant began condemnation proceedings to take an easement over twenty-five acres of the plaintiffs' property. For a thirty-one year period, the easement permits the defendant to access the property to withdraw groundwater, to collect environmental data and to pump and treat groundwater so as to remediate the

existing contamination.[2] The defendant filed a certificate of taking with the clerk of the Superior Court and recorded the certificate in the Southington land records on September 17, 1997. In accordance with a statement of compensation, the defendant made a deposit of $50,000.

"On January 26, 1998, the plaintiffs filed an appeal in the trial court to challenge the adequacy of the proffered compensation award. They made two claims. Their first claim was that, as a matter of law, their damages should be measured by a valuation formula compensating them for the pollution of their groundwater both before and after the taking of their property rights through eminent domain. Their second claim was that, as a matter of fact, the valuation of their property should take into account possible future uses of their property for purposes other than its present use for mining. The defendant disputed both of these claims.

"The trial court rendered a judgment deciding the plaintiffs' claim of law in favor of the defendant.[3] It agreed with the defendant that the damages suffered by the plaintiffs as a result of the condemnation of their property were to be measured by comparing the value of their property at the time of the taking, in its polluted condition, with its value after the condemnation. It also agreed with the defendant that monetary compensation awarded to the plaintiffs for the easement that the

---

[2] The consent order provided that "[e]ach instrument establishing any right of possession to the zone of influence shall, at a minimum, provide . . . the right to discharge pollutants to the ground water within the zone . . . ." In accordance with that directive, the easement also allowed the defendant to "release and deposit contaminants and pollution directly or indirectly, into, on or in the groundwaters and subsurface soils and formations within the Zone of Influence Easement Area."

[3] Although the trial court adopted the defendant's valuation formula, it determined that the defendant had undervalued the plaintiffs' damages and increased the compensation award. See *Albahary* v. *Bristol*, supra, 84 Conn. App. 331–32 and n.1.

defendant has taken should be based on the likelihood that the plaintiffs would continue to use their property for mining." *Albahary* v. *Bristol,* supra, 84 Conn. App. 332–34.

"Before the present state court condemnation proceedings had begun, the plaintiffs filed an action against the defendant in [federal court]. They sought damages and injunctive relief for the injury that they had suffered as a result of the landfill's contamination of the groundwater on their property prior to the condemnation.

"The federal case was decided after the filing of the complaint in this present condemnation case. The federal court held that the plaintiffs had proven most of their statutory and common-law claims, but not their claim of inverse condemnation.[4] With respect to that claim, the court found that the plaintiffs' receipt of $2.65 million from their mineral extraction contracts demonstrated that the contamination caused by the defendant had not deprived the plaintiffs of the reasonable use of their property. The court denied the plaintiffs any damages even for the claims that they had proven because 'the legal remedy of money damages to compensate the current landowners for diminished value of their property is inadequate and highly speculative . . . .' Instead, the court ordered the defendant to provide the plaintiffs with an alternate potable water

---

[4] "The federal court decided that the plaintiffs had proven all but three of the claims contained in their ten count complaint. It held that the defendant had violated two federal environmental statutes, the Resource Conservation Recovery Act, 42 U.S.C. § 6901 et seq. and the Clean Water Act, 33 U.S.C. § 1251 et seq. It also held that the contamination of the plaintiffs' property was both a public and private nuisance, a trespass, an act of negligence and a violation of General Statutes §§ 22a-427 and 22a-16. It held, however, that the plaintiffs had not proven their claim of inverse condemnation and strict liability. Also, because the plaintiffs had not undertaken any remediation of their property, it dismissed their claims for remediation and containment costs under General Statutes § 22a-452." *Albahary* v. *Bristol,* supra, 84 Conn. App. 338 n.4.

source and to indemnify the plaintiffs against claims of environmental liability that might be raised by third persons. No appeal was taken from this judgment." Id., 337–38.

In the present case, the trial court determined that the damages suffered by the plaintiffs from the condemnation of their property were to be measured by comparing the value of their property at the time of the taking, in its polluted condition, with its value after the condemnation. The trial court stated, in support of its conclusion, that "[t]he record before this court demonstrates that the plaintiffs [in their federal court action] have sought and obtained damages for the [past] contamination to their property caused by the city's landfill. They are therefore barred from litigating the same issues in this proceeding."

The plaintiffs appealed to the Appellate Court claiming, inter alia, that the trial court "improperly [had] confined its analysis of the damages they had suffered to a comparison between the value of their property in its polluted condition and its value after the taking of the easement." *Albahary* v. *Bristol,* supra, 84 Conn. App. 334. The Appellate Court rejected the defendant's argument that the valuation in the present case was governed by this court's holding in *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership,* 256 Conn. 813, 832–34, 776 A.2d 1068 (2001) (*ATC*), that the market value of a condemned property must be determined on the basis of the condition of the property on the date of the taking. *Albahary* v. *Bristol,* supra, 336. The Appellate Court reasoned that "[e]xtension of the valuation formula of *ATC* to a case such as this one [in which the condemnor itself has caused the contamination] would be difficult to reconcile with the law of inverse condemnation." Id. The court concluded that, as a general matter, the amount of compensation for a taking is not "always limited to a comparison between the

value of the property at the time of the taking and its value after the taking"; id., 335; but that "a condemnation award may . . . take account of pretaking contamination caused by the condemnor." Id., 337. The court also concluded, however, that "[t]he plaintiffs' inverse condemnation claim [related to pretaking contamination of their property] indisputably was 'actually litigated and necessarily determined' by the federal court"; id., 339; and, therefore, was barred by principles of collateral estoppel. Id., 339–41. These appeals followed.

Because our resolution of the issue raised in the defendant's appeal guides our resolution of the plaintiffs' appeal, we first address that issue.[5] The defendant claims that the Appellate Court improperly concluded that, in determining the amount of the plaintiffs' just compensation, the plaintiffs had a right, in principle, to be compensated for the totality of the damage caused to their property by the defendant's contamination of the plaintiffs' groundwater. In support of this claim, the defendant cites our decision in *ATC* and a number of other cases for the proposition that personal liability for damages incurred before the taking cannot be liti-

---

[5] Although the parties have not raised the issue in their briefs to this court, there is some question as to whether the defendant was aggrieved by the Appellate Court's decision and, therefore, has standing to raise this claim on appeal. See *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 192, 676 A.2d 831 (1996) ("pleading and proof of aggrievement are prerequisites to the trial court's jurisdiction over the subject matter of appeal"). "Ordinarily, a party that prevails [on appeal] is not aggrieved." *Seymour* v. *Seymour*, 262 Conn. 107, 110, 809 A.2d 1114 (2002). This court previously has suggested, however, that a prevailing party may be aggrieved if it will suffer some harm in other proceedings as a result of the decision under appeal. See *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 264–66, 777 A.2d 645 (2001). We conclude that we need not determine in the present case whether the defendant was aggrieved because we may treat its claim as an alternate ground for affirmance. See *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 443–44, 844 A.2d 836 (2004) (dismissing defendants' appeal for lack of aggrievement but considering issue raised by defendants as alternate ground for affirmance).

gated in a condemnation proceeding, but must be litigated in an independent suit for damages.[6] The plaintiffs counter that *ATC* is inapplicable here because it did not involve damages caused by the condemnor. They further argue that, because the defendant, by depositing contaminants on their property, physically took possession of it before filing its notice of condemnation, the property should be valued as of the date that the defendant took possession. See *Slavitt* v. *Ives*, 163 Conn. 198, 207, 303 A.2d 13 (1972);[7] *Carl Roessler, Inc.* v. *Ives*, 156 Conn. 131, 143, 239 A.2d 538 (1968).[8] In turn, the

[6] See *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, supra, 256 Conn. 833 (environmental damage and remediation costs may be considered in valuing real property taken by eminent domain); id., 838–39 (determining responsibility for environmental damage is not at issue in eminent domain proceeding); see also *D'Addario* v. *Commissioner of Transportation*, 172 Conn. 182, 185, 374 A.2d 163 (1976) (injuries resulting from negligence of condemnor's contractor are not recoverable in condemnation proceeding but must be relegated to independent proceeding); *Plunske* v. *Wood*, 171 Conn. 280, 284, 370 A.2d 920 (1976) (injuries resulting from condemnor's negligence are not recoverable in condemnation proceeding); *Russo* v. *East Hartford*, 4 Conn. App. 271, 274 n.2, 493 A.2d 914 (1985) ("We recognize the limited scope of an appeal from a statement of compensation in an eminent domain proceeding . . . and that there are circumstances which may warrant an independent action to determine questions which cannot be reached in such a proceeding. An independent action is justified, for example, where the negligence of a contractor which is a necessary, natural and proximate result of the taking has caused damage to remaining property . . . ." [Citations omitted.]); *Silver Creek Drain District* v. *Extrusions Division, Inc.*, 468 Mich. 367, 380–81, 663 N.W.2d 436 (liability for environmental contamination may not be litigated in condemnation proceeding), rehearing denied, 469 Mich. 1222, 668 N.W.2d 145 (2003), cert. denied, 540 U.S. 1107, 124 S. Ct. 1062, 157 L. Ed. 2d 893 (2004).

[7] This court concluded in *Slavitt* that the date of the taking of the plaintiff's property was the date that the defendant took possession of an adjacent property that was subject to a right-of-way to the plaintiff's property and was the plaintiff's sole means of access to his property, rather than the date that the defendant condemned the plaintiff's property de jure. *Slavitt* v. *Ives*, supra, 163 Conn. 207.

[8] "The usual rule is that if the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking. It is that event which gives rise to the claim for compensation and fixes the date as of which the land is to be valued

defendant responds that the plaintiffs waived this claim, which implicitly relies on principles of inverse condemnation, by not raising it before the trial court or the Appellate Court. We conclude that the Appellate Court properly determined that, generally, under principles of inverse condemnation, a property owner may seek compensation in an eminent domain proceeding for pretaking damages caused by the condemnor.

At the outset, we set forth the standard of review. Whether a claim for compensation for the pretaking contamination of a property by the condemning entity may be raised in an eminent domain proceeding is a question of law over which our review is plenary. See *Kelly* v. *New Haven*, 275 Conn. 580, 607, 881 A.2d 978 (2005).

In order to address the substance of the defendant's claim on appeal, it is necessary first to clarify the nature of the plaintiffs' underlying claim. The defendant's principal argument is premised on its characterization of the plaintiffs' claim for damages for the pretaking contamination of their property as an action for in personam liability. The plaintiffs argue in their brief on their appeal that their claim is an action for just compensation for the taking of their property under well settled eminent domain principles. In their brief on the defendant's appeal, however, the plaintiffs argue that they are entitled to compensation based on the value of the property in its uncontaminated condition because "the taking occurred when the defendant began its physical occupation of the easement area" and "the defendant physically took possession of the 'property' it later condemned by depositing chemical contaminants in the easement area before filing its notice of condemnation." Accordingly, we conclude that, as the Appellate Court

and the Government's obligation to pay interest accrues." (Internal quotation marks omitted.) *Carl Roessler, Inc.* v. *Ives*, supra, 156 Conn. 143.

suggested, the plaintiffs' claim implicates principles of inverse condemnation.[9] See *Albahary* v. *Bristol*, supra, 84 Conn. App. 336 (concluding that denial of right to compensation for pretaking damage would be inconsistent with law of inverse condemnation).

Although this court previously has not had occasion to consider the specific issue in this case—whether *pretaking* property damages caused by a condemnor are recoverable in a condemnation proceeding—we have considered a related issue. In *Plunske* v. *Wood*, 171 Conn. 280, 282, 370 A.2d 920 (1976), the defendant, the commissioner of transportation, condemned a portion of the plaintiff landowner's property in order to improve a road. The defendant also took "from the plaintiff's remaining land . . . rights to grade, the right to construct a driveway, and a drainage easement." Id. The defendant assessed the damages for the taking at $2400 and the plaintiff appealed to the trial court. Id. During the pendency of the appeal, the plaintiff's remaining property was damaged by acts of the defendant's contractor. Id. The trial court's award to the plaintiff included the costs of repairing those damages. Id., 283. The defendant appealed to this court claiming that such damages were not recoverable in a condemnation proceeding. Id. We concluded that, in determining damages in a condemnation action, "[t]he court should consider any and all damages which will foreseeably follow from the proper construction of the project, *including any damage to the remainder which is a necessary, natural and proximate result of the taking.* . . . The use to be made of the land taken is to be considered with regard to its effect on the remaining

[9] "Inverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." (Internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 73, 808 A.2d 1107 (2002).

land, and the fact that injuries are caused by the construction activities of the contractor is not a bar to recovery so long as the damages foreseeably follow such construction activities and are a necessary, natural and proximate result of the taking. . . . Expenses required to cure injuries caused to the remaining land are not recoverable as such, but are merely evidence of elements in the decrease in market value, of which they may be an accurate measure." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 284. Damages caused by the *negligence* of the condemnor's contractor, however, ordinarily are not recoverable in a condemnation proceeding, but must be sought in an independent action. Id. Because the trial court in *Plunske* had not made any findings as to whether the damages were a "necessary, natural and proximate result of the taking"; id.; or, instead, were caused by the contractor's negligence, we remanded the case for a new trial. Id., 285.

Thus, in *Plunske*, this court concluded that a plaintiff can receive just compensation in a condemnation proceeding for damage to land that has not been formally taken if the damage is the necessary, natural and proximate result of a taking for a public use. Id., 284–85. In other words, we effectively concluded that, if damage to the untaken land is the necessary, natural and proximate result of a public use, then the land, or at least certain interests in it, have been taken by inverse condemnation and the plaintiff is therefore entitled to just compensation.[10] If the damages are caused by the con-

[10] The primary difference between *Plunske* and the present case is that, in *Plunske*, the untaken land was damaged because of operations on the portion of the plaintiff's land that formally had been taken for a public use, while, in the present case, no portion of the plaintiffs' land had been taken prior to the damage. It could be argued that the issue that we addressed in *Plunske* was how to determine the scope of a formal taking, rather than how to determine whether land was taken by inverse condemnation, and that *Plunske* is inapplicable when the scope of a formal taking is not at issue. We can perceive no reason, however, to read *Plunske* so narrowly. If the scope of a formal taking is subsequently expanded by the operations

demnor's negligence, however, then the plaintiff is relegated to an action sounding in tort. Accordingly, we

---

of the condemnor, it only can be by way of inverse condemnation. Accordingly, the standard applied to determine whether the scope has been expanded is equally applicable to claims of inverse condemnation when there has been no prior taking.

Numerous courts have confronted the problem of how to characterize a claim for damage to property caused by a government entity when there has been no formal taking of the damaged property. They generally have agreed that such actions fall into two categories: actions for inverse condemnation and common-law actions for damages. See *Columbia Basin Orchard* v. *United States*, 132 F. Sup. 707, 708–709 (Ct. Cl. 1955) (whether contamination of spring waters and subsequent damage to plaintiff's orchard as result of government's actions was taking or tort); *Robinson* v. *Ashdown*, 301 Ark. 226, 227–28, 783 S.W.2d 53 (1990) (whether damages caused by effluent from sewer plant could be recovered in action for inverse condemnation or whether plaintiffs were required to seek recovery in negligence action, which was barred by sovereign immunity); *Foss* v. *Maine Turnpike Authority*, 309 A.2d 339, 344 (Me. 1973) (whether damage to property from salt runoff from snow removal operations constituted nuisance or trespass or, instead, constituted inverse condemnation); *Electro-Jet Tool & Mfg. Co.* v. *Albuquerque*, 114 N.M. 676, 677–79, 845 P.2d 770 (1992) (whether property damage caused by city's maintenance of drainage ditches could be recovered in action for inverse condemnation or whether claim must be characterized as tort claim, which was barred by sovereign immunity); *O'Brien* v. *Syracuse*, 54 N.Y.2d 353, 355, 429 N.E.2d 1158, 445 N.Y.S.2d 687 (1981) (whether trespass claim against city was barred under doctrine of res judicata by earlier dismissal of inverse condemnation claim arising from same conduct); *Sarnelli* v. *New York*, 256 App. Div. 2d 399, 400, 681 N.Y.S.2d 578 (1998) (whether city's use of plaintiff's property was inverse condemnation subject to statute of limitations or was continuous trespass); *Sassone* v. *Queensbury*, 157 App. Div. 2d 891, 892–93, 550 N.Y.S.2d 161 (1990) (whether town's use of plaintiff's property was trespass or inverse condemnation); *Carr* v. *Fleming*, 122 App. Div. 2d 540, 540–41, 504 N.Y.S.2d 904 (1986) (whether landowner could recover damages for installation of sewer line in both trespass action and action for inverse condemnation); *Tuffley* v. *Syracuse*, 82 App. Div. 2d 110, 112–13, 442 N.Y.S.2d 326 (1981) (whether court could award damages caused by hidden culvert owned by city under theory of inverse condemnation when plaintiff sought damages for trespass); *Knapp* v. *Livingston*, 175 Misc. 2d 112, 116, 667 N.Y.S.2d 662 (1997) (whether trial court properly awarded damages for installation of drainage pipe on plaintiff's property under theory of inverse condemnation or was limited to issuing injunction under theory of trespass or nuisance); *Evans* v. *Johnstown*, 96 Misc. 2d 755, 759, 410 N.Y.S.2d 199 (1978) (whether landowner could seek recovery for damage arising from city's operation of sewer plant in action for inverse condemnation or must seek damages under theories of trespass, negligence or nuisance).

The courts have adopted a wide variety of standards, however, for determining into which category a particular claim should fall. Several New

agree with the Appellate Court that, if the damage to the plaintiffs' property was the necessary, natural and proximate result of a public use, and the claim for compensation was not otherwise barred, the trial court could consider the pretaking contamination in determining the amount of the compensation award. See *Albahary* v. *Bristol*, supra, 84 Conn. App. 337.

York courts have held that "*de facto* appropriation, in the context of physical invasion, is based on showing that the government has intruded onto the citizen's property and interfered with the owner's property rights to such a degree that the conduct amounts to a constitutional taking requiring the government to purchase the property from the owner; only at that point does title actually transfer. [T]he taking occurs when interference with the owner's use has occurred to such an extent that an easement by prescription will rise by lapse of time . . . . In effect, *de facto* appropriation may be characterized as an aggravated form of trespass. . . . The basic distinction lies in the egregiousness of the trespass and whether it is of such intensity as to amount to a taking." (Citation omitted; emphasis in original; internal quotation marks omitted.) *O'Brien* v. *Syracuse*, supra, 54 N.Y.2d 357. More recently, a New York court has held that, in a case wherein the plaintiff claimed damage to her property as a result of the government's conduct, "[i]n order for a court to grant an order of inverse condemnation it is necessary to show that the use sought is a public use, that there is a public necessity therefor, and that the taking is under a color of right." *Knapp* v. *Livingston*, supra, 175 Misc. 2d 118.

Other courts have held that "[a] tort action may lie in the proper forum for . . . an incidental or consequential injury, but not a suit for just compensation. There must have been an intent on the part of the defendant to take [the] plaintiff's property or an intention to do an act the natural consequence of which was to take its property." *Columbia Basin Orchard* v. *United States*, supra, 132 F. Sup. 709; see also *Robinson* v. *Ashdown*, supra, 301 Ark. 232 ("[w]hen a municipality acts in a manner which substantially diminishes the value of a landowner's land, and its actions are shown to be intentional, it cannot escape its constitutional obligation to compensate for a taking of property on the basis of its immunity from tort action"); *Electro-Jet Tool & Mfg. Co.* v. *Albuquerque*, supra, 114 N.M. 683 (governmental "act must at least be one in which the risk of damage to the owner's property is actually foreseen by the governmental actor, or in which it is so obvious that its incurrence amounts to the deliberate infliction of harm for the purpose of carrying out the governmental project"). Still other courts have focused on whether the defendant's conduct was "legislatively unauthorized or performed in an unreasonable or excessive manner"; (internal quotation marks omitted) *Evans* v. *Johnstown*, supra, 96 Misc. 2d 762; in which case the plaintiff is relegated to a tort action, or, instead, whether the conduct was "both authorized and reasonably performed"; (internal quotation marks omitted) id.; in which case the plaintiff is entitled to "the same damages as would be available to them in a proceeding in Eminent Domain." (Internal

The defendant argues, however, that "the legal principles [precluding the litigation of personal liability issues in condemnation proceedings] that drove the outcome of *ATC* apply with equal force in inverse condemnation actions." In support of this argument, the defendant relies on *Shealy* v. *Athens-Clarke*, 244 Ga. App. 853, 537 S.E.2d 105 (2000). In that case, the plaintiffs brought a claim for inverse condemnation alleging that their property had been contaminated by hazardous substances that had escaped from a landfill operated by the defendant. Id. Before the plaintiffs initiated the action, the defendant had initiated two separate condemnation proceedings relating to the property. Id. After the inverse condemnation action was brought, awards were entered in the two condemnation actions. Id., 854. The court in the inverse condemnation action then granted the defendant's motion to dismiss the action as moot in light of the condemnation awards. On appeal, the Georgia Court of Appeals reversed the judgment of the trial court reasoning that "[l]osses occurring prior to the date of taking are not compensable in a condemnation proceeding. In particular, losses resulting from a previous taking, even by the same condemnor, are not recoverable in a condemnation proceeding, since [s]uch damages are not a consequence of the instant taking. Such damages must be recovered in an independent suit for damages, and may not be raised in the current condemnation proceeding." (Internal quotation marks omitted.) Id., 855. Because pretaking damages could not be recovered in the condemnation proceeding, the court concluded that the plaintiff was entitled to seek them in the inverse condemnation proceeding. Id., 856; see also *Flo-Rob, Inc.* v. *Colonial Pipeline Co.*, 170 Ga. App. 650, 651–52, 317 S.E.2d 885 (1984) (claim for damages for pretaking con-

quotation marks omitted.) Id.; see also *Foss* v. *Maine Turnpike Authority*, supra, 309 A.2d 344 (same).

tamination could not be raised as counterclaim in condemnation proceedings because such damages were not consequence of taking; claim had to be made in independent suit for damages).

We do not agree with the court in *Shealy* that an inverse condemnation claim relating to a formally taken property cannot be raised in an ongoing condemnation proceeding. Requiring separate proceedings would be both unnecessarily duplicative and inconsistent with our case law. See *Plunske* v. *Wood,* supra, 171 Conn. 284–85 (claim for damages to formally untaken property may be made in condemnation action); *Slavitt* v. *Ives,* supra, 163 Conn. 207 (in condemnation action, plaintiff is entitled to compensation based on value of property on date government entered into possession); *Carl Roessler, Inc.* v. *Ives,* supra, 156 Conn. 143 (same); *Claud-Chambers* v. *West Haven,* 79 Conn. App. 475, 478–79, 830 A.2d 385 (plaintiffs precluded from bringing separate action for inverse condemnation after conclusion of eminent domain proceeding where plaintiff failed to challenge or appeal from compensation received), cert. denied, 266 Conn. 924, 855 A.2d 472 (2003). Accordingly, we reject this claim.

The defendant also argues that allowing the plaintiffs to recover property damages in a condemnation proceeding would expand improperly the scope of the proceeding as defined by General Statutes § 8-132.[11] In support of this argument, the defendant cites our statement in *Research Associates, Inc.* v. *New Haven Rede-*

---

[11] General Statutes § 8-132 (a) provides: "Any person claiming to be aggrieved by the statement of compensation filed by the redevelopment agency may, at any time within six months after the same has been filed, apply to the superior court for the judicial district in which such property is situated for a review of such statement of compensation so far as the same affects such applicant. The court, after causing notice of the pendency of such application to be given to the redevelopment agency, may appoint a judge trial referee to make a review of the statement of compensation."

*velopment Agency*, 152 Conn. 137, 140, 204 A.2d 833 (1964), that the "state referee has authority [under § 8-132] to determine the value only at the date of taking, and this date . . . is fixed by [General Statutes] § 8-129[12] as the date of the recording of the certificate [of taking]."[13] We also stated in *Research Associates, Inc.*, however, that the date of the taking was fixed by § 8-129 only "in the absence of special equitable considerations"; id.; and that the condemnee was entitled to claim another date as the "true date of the taking . . . prior to entry of the order referring to a referee, for review, the defendant's assessment of damages." Id., 140–41.

Implicitly recognizing this exception to § 8-129, the defendant in the present case next argues that the plaintiffs are barred from claiming a different date of taking before this court, thereby implicitly raising a claim of inverse condemnation, because they never made such a claim before the trial court.[14] We agree that the plaintiffs are barred from bringing this claim, but for a different reason. Specifically, we conclude that the Appellate

---

[12] General Statutes § 8-129 provides in relevant part: "The redevelopment agency shall determine the compensation to be paid to the persons entitled thereto for such real property and shall file a statement of compensation, containing a description of the property to be taken and the names of all persons having a record interest therein and setting forth the amount of such compensation, and a deposit as provided in section 8-130, with the clerk of the superior court for the judicial district in which the property affected is located. . . ."

[13] We note that §§ 8-129 and 8-132 apply to takings by a redevelopment agency. The defendant has provided no authority for the proposition that they are applicable in the present case. Cf. *Stocker* v. *Waterbury*, 154 Conn. 446, 451, 226 A.2d 514 (1967) (§ 8-129 is not applicable to taking by parking authority). For the purposes of this opinion, we assume, without deciding, that the statutes are applicable.

[14] The defendant also claims that it did not take the plaintiffs' property before it filed the statement of compensation because it did not physically possess the property to the plaintiffs' exclusion prior to that date. We have concluded, however, that damage to property may constitute an inverse condemnation if the damage is the necessary, natural and proximate result of a public use.

Court properly determined that the claim for diminution in property value in the present case, which implicates principles of inverse condemnation, was barred by principles of collateral estoppel because the federal court concluded that the contamination of the plaintiffs' property was a result of the defendant's negligence and granted relief designed to restore the plaintiffs to the position that they would have been in had the contamination never occurred. See *Albahary* v. *Bristol*, supra, 84 Conn. App. 337–41.

"[C]ollateral estoppel, or issue preclusion, is that aspect of res judicata that prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim. . . . An issue is *actually litigated* if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Efthimiou* v. *Smith*, 268 Conn. 499, 506–507, 846 A.2d 222 (2004). Whether the Appellate Court properly applied the principles of collateral estoppel in the present case is a question of law over which our review is plenary. See *Corcoran* v. *Dept. of Social Services*, 271 Conn. 679, 688, 859 A.2d 533 (2004).

In the federal case, the court concluded that the "plaintiffs have proven that the [defendant] was negligent in its operation of the [l]andfill and that its negligence caused [the] plaintiffs' property damage." The court also determined that "the legal remedy of money damages to compensate [the plaintiffs] for [the] diminished value of their property [was] inadequate and highly speculative," and that the plaintiffs' injury was " 'otherwise irremediable.' " Accordingly, "in order to put [the] plaintiffs in the same position they would have been in had the leachate contamination emanating from the [l]andfill not been permitted to pollute the ground-

water beneath the . . . [p]roperty and render it unusable," the court ordered injunctive relief, including an order that the defendant provide the plaintiffs with a potable water source for the property and file on the land record documentation that the defendant will indemnify, hold harmless and defend the plaintiffs and subsequent owners against any claims of environmental liability. The court stated that "[t]his injunctive relief . . . restores to the affected property that which it lost, removes, in part, the stigma of known contamination as it affects financing and willingness of lending institutions to finance a sale of the property, and protects future landowners from strict liability for leachate plume migration, for which they bear no responsibility." Finally, the court held that "no monetary damages for [the] defendant's negligent operation of the [l]andfill . . . are warranted."

In the present case, the plaintiffs again seek to recover monetary damages for the diminution in their property value as a result of contamination from the defendant's operation of the landfill. As we have indicated, in order to bring this claim within the context of a condemnation proceeding, the plaintiffs must establish that the damage to their property was the necessary, natural and proximate result of the operation of the landfill, and not the result of the defendant's negligence. *Plunske* v. *Wood*, supra, 171 Conn. 284; cf. *Sassone* v. *Queensbury*, 157 App. Div. 2d 891, 893, 550 N.Y.S.2d 161 (1990) ("[d]efendant's entry upon plaintiff's property was *either* a trespass *or* a de facto appropriation" [emphasis added]). The federal court already has concluded, however, that the contamination was the result of the defendant's negligence and has ordered a remedy to compensate the plaintiffs fully for the property damage. Accordingly, we conclude that the plaintiffs' claim was actually litigated and necessarily determined in the federal court and is, therefore, barred

by principles of collateral estoppel. Cf. *O'Brien* v. *Syracuse*, 79 App. Div. 2d 874, 875, 434 N.Y.S.2d 547 (1980) ("[s]ince respondent's present [trespass] claim arises out of the same series of events as his [previously adjudicated] *de facto* condemnation claim, the present claim is barred by *res judicata*" [emphasis in original]).[15] To compensate the plaintiffs in the present action for the diminution in their property value in order to place them in the same position that they would have been in if the contamination never had occurred would result in a double recovery for the plaintiffs. They would receive *both* a permanent source of potable drinking water and permanent indemnification of any future environmental claims against them *and* compensation on the basis of the value of the land in its uncontaminated condition.[16]

---

[15] Cf. *Electro-Jet Tool & Mfg. Co.* v. *Albuquerque*, 114 N.M. 676, 679, 845 P.2d 770 (1992) ("negligence is irrelevant to a viable claim for inverse condemnation"). In *Electro-Jet Tool & Mfg. Co.*, the plaintiff brought an action against the defendant city raising both a claim for inverse condemnation and a claim for negligence. Id., 677. The trial court dismissed the inverse condemnation claim, apparently because it concluded that "a claim for inverse condemnation and a claim for negligence are mutually exclusive . . . ." Id., 678. On appeal, the Supreme Court of New Mexico concluded that the elements of a negligence claim and of an inverse condemnation claim are different. Id., 683. It further concluded that, although the trial court properly had dismissed the inverse condemnation claim because the plaintiff had failed to allege the elements of the claim, the plaintiff should be allowed to *replead* the claim; id., 685–86; because "negligence is irrelevant to a viable claim for inverse condemnation." Id., 679. The court did not suggest, however, that the plaintiff would be entitled to *recover* under both theories.

[16] The plaintiffs argue that "all of the factors that would enter into the determination of value became fixed as of [September 17, 1997, the date of the taking]." Because the federal court had not yet issued injunctive relief as of that date, they argue, "the proper valuation of the interests taken by [the defendant] could not be affected by that relief." The point, however, is not that the value of the property was affected by the federal court's order—although, of course, it almost certainly was. The point is that the plaintiffs cannot recover damages under *both* a negligence claim *and* an inverse condemnation claim arising from the same conduct.

The plaintiffs claim, however, that the federal court did not hold that the plaintiffs were not entitled to monetary compensation for the diminution in the value of their property. In support of this claim, they point out that the court explicitly stated in its memorandum of decision that "the injunctive remedy ordered is in addition to the monies ordered to be paid in the state law condemnation action, which are intended to pay for the acquisition of rights to the groundwater beneath [the] plaintiffs' property. It is the intention of the [c]ourt that those funds *not* be used to offset the costs of providing water to the . . . [p]roperty. The form of injunctive relief ordered permits the state court condemnation and challenge to proceed without interference, direct or indirect, by the federal court, thus satisfying this [c]ourt's comity concerns." (Emphasis in original.) The court concluded that "no monetary damages for [the] defendant's negligent operation of the [l]andfill, beyond the injunctive relief ordered *and the compensation for the groundwater taking*, are warranted." (Emphasis added.)

We are not persuaded by the plaintiffs' claim. First, the certificate of taking filed by the defendant affected property interests not at issue in the federal case. It allowed the defendant, for the duration of thirty-one years, to enter onto the plaintiffs' property for the purpose of withdrawing groundwater, to transport machinery and materials over the plaintiffs' land for the purpose of monitoring and treating the groundwater, to pump and treat groundwater, and to perform related activities. We interpret the federal court's statements to mean that, because the value of the plaintiffs' property as a result of the taking of these interests was not at issue in the federal case, its decision should not affect the state action. Second, the federal court did not conclude that the plaintiffs were not entitled to monetary damages for diminution in property value

because they would receive such compensation in the present case. Rather, it declined to award such damages because it believed that they would be "inadequate and highly speculative, in light of many variables such as likelihood of zoning changes for [the] plaintiffs' property, permissible forms of access through its protected wetlands, availability of remaining sand and gravel resources on site, and real estate market interest" and because the court could restore the plaintiffs to the position that they would have been in if the contamination had not occurred by granting injunctive relief.

The plaintiffs also argue that the issue litigated in the federal court was not the same as the issue raised in the present case because the inverse condemnation claim in the federal court case involved the value of the property as a whole, while the present action involves the value of limited interests in the property.[17] We have not concluded, however, that the claim in the present case is duplicative of the inverse condemnation claim in the federal case. Rather, we have concluded that it is duplicative of the *negligence* claim in that case.[18]

---

[17] We are not entirely convinced that this is an accurate characterization of the federal court's decision. The federal court recognized that, under the federal constitution, "property rights are severable, that is, an unconstitutional taking may occur where one property right in the . . . bundle of property rights is infringed." It concluded that the "plaintiffs have not proved that they have been deprived of the reasonable use of their land where the evidence shows that drinking water could be brought to the property . . . ." Read together, these statements reasonably may be interpreted as meaning that the plaintiffs had not proved that their interest in uncontaminated water had been taken.

[18] We recognize that the Appellate Court concluded that "the plaintiffs are precluded from relitigating the federal court's denial of their *inverse condemnation* claim." (Emphasis added.) *Albahary* v. *Bristol*, supra, 84 Conn. App. 338–39. In the Appellate Court's view, the federal court rejected this claim because it concluded that "the plaintiffs did not suffer any economic loss because of the pretaking pollution of the groundwater on their property." Id., 341. The *reason* that the plaintiffs suffered no such loss, however, was that the federal court granted full relief to the plaintiffs in connection with their other claims. Id. The federal court explicitly stated

Finally, the plaintiffs argue that the Appellate Court, in determining that they were not entitled to recover the diminution in their property value, improperly ignored the fact that the defendant's easement allows it to continue contaminating the property. Specifically, they argue that, because the easement deprived them of their right under General Statutes § 22a-452[19] to remediate the property at the defendant's expense, and because the easement allows the defendant to continue the contamination, "clean groundwater will be legally unavailable to the plaintiffs for [thirty-one] years *more* than it would have been if the easement had not been taken; and, consequently . . . the value of the easement must be measured by comparing clean land to polluted land." (Emphasis in original.)

We are not persuaded. In support of their claim, the plaintiffs argue that "whatever 'damages' the plaintiffs

---

that the plaintiffs had not been deprived of the use of their land because "the evidence shows that drinking water could be brought to the property . . . ." Thus, even if we were to agree with the Appellate Court that the federal court addressed the limited taking claim raised by the plaintiffs in the present case as an aspect of their inverse condemnation claim; see footnote 17 of this opinion; we would conclude that the federal court denied the claim on the ground that it was able to grant full relief under the other claims. The inverse condemnation claim in the present case should be denied for the same reason.

[19] General Statutes § 22a-452 (a) provides: "Any person, firm, corporation or municipality which contains or removes or otherwise mitigates the effects of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes resulting from any discharge, spillage, uncontrolled loss, seepage or filtration of such substance or material or waste shall be entitled to reimbursement from any person, firm or corporation for the reasonable costs expended for such containment, removal, or mitigation, if such oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes pollution or contamination or other emergency resulted from the negligence or other actions of such person, firm or corporation. When such pollution or contamination or emergency results from the joint negligence or other actions of two or more persons, firms or corporations, each shall be liable to the others for a pro rata share of the costs of containing, and removing or otherwise mitigating the effects of the same and for all damage caused thereby."

might have recovered for the pollution existing prior to the date of the taking would not have prevented them, *after* the date of the taking, from cleaning up the groundwater at [the] defendant's expense . . . ." (Emphasis in original.) Thus, the plaintiffs implicitly argue that the relief ordered by the federal court was intended to compensate them *only* for the *pretaking* contamination.[20] As we have indicated, however, the federal court granted a *permanent* injunction designed to "put [the] plaintiffs in the same position they would have been in had the leachate contamination emanating from the [l]andfill not been permitted to pollute the groundwater beneath the . . . [p]roperty . . . ." Regardless of when the contamination occurred, the harm that it caused was depriving the plaintiffs of a source of potable water on the property and exposing them to environmental claims by third parties. The relief ordered by the federal court fully compensated the plaintiffs for these injuries.

This becomes clear if we hypothesize a situation in which the pretaking contamination was caused by a third party and was of a more ephemeral nature, such as the discharge of pollutants into a stream running through the plaintiffs' property. If a court entered a *permanent* injunction requiring the third party to provide a source of potable water and to indemnify the plaintiffs from environmental claims in order to place the plaintiffs in the same position that they would have been in if the stream had never been polluted, the plaintiffs would not be entitled to additional compensation from a successor polluter on the ground that the stream would have been clean in the absence of the continuing pollution. Rather, the third party would be entitled to

---

[20] This argument appears to be inconsistent with the plaintiffs' argument in the defendant's appeal that they are entitled in this proceeding to compensation for the pretaking contamination of the property because the defendant took the property by inverse condemnation.

claim that the permanent injunction against it should be lifted because the successor polluter should now be held responsible for the pollution.

This court's decisions in *Avery* v. *White*, 83 Conn. 311, 76 A. 360 (1910), and *Platt Bros. & Co.* v. *Waterbury*, 80 Conn. 179, 67 A. 508 (1907), are not to the contrary. Those cases involved claims of ongoing wrongful conduct in which the plaintiffs were found to be entitled to money damages even though they previously had received damages for injuries arising from the same conduct. In both cases, this court concluded that the claims were not barred because the previous damage award had been intended to compensate the plaintiffs for injuries that were not at issue in the case under review. See *Avery* v. *White*, supra, 313 (trial court properly rejected collateral estoppel defense when prior action involved claim for damages for trees cut during one period and present action involved claim for different trees cut during subsequent period); *Platt Bros. & Co.* v. *Waterbury*, supra, 182 ("[a] judgment for all damage . . . caused [by continuing nuisance] must cover all damage from the unlawful acts done prior to the commencement of the action in which it is rendered; but additional damage caused by like subsequent unlawful acts may be recovered in another action"). In the present case, however, the federal court treated the contamination, both pretaking and posttaking, as a single permanent injury and entered an award that was intended to compensate the plaintiffs fully for it. Accordingly, we reject the plaintiffs' claim.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.