# NEW ENGLAND ESTATES, LLC *v.* TOWN OF BRANFORD ET AL.
## (SC 18132)

Norcott, Katz, Palmer, Zarella and McLachlan, Js.*

---

* This case was argued prior to the implementation of the policy of this court to hear all cases en banc.

818

Argued May 26, 2009—officially released February 16, 2010

*Wesley W. Horton* and *William H. Clendenen, Jr.*, with whom, were *Kimberly A. Knox* and, on the brief, *Kevin C. Shea, Kenneth J. Bartschi, David A. Reif, Matthew A. Weiner, Jonathan M. Freiman, Kerry R. Callahan* and *Daniel R. Canavan*, for the appellant (named defendant).

*Timothy S. Hollister*, with whom was *Sheila A. Huddleston*, for the appellee (plaintiff).

*Linda L. Morkan*, with whom, on the brief, were *Stephen R. Humphrey, Brian R. Smith* and *Jeffrey J. White*, for the cross appellants (defendants Thomas Santa Barbara, Jr., et al.).

*William H. Ethier, Mary Lynn Huett, Kristy M. Rogan* and *Thomas F. Geselbracht*, filed a brief for the National Association of Home Builders et al. as amici curiae.

*Opinion*

McLACHLAN, J. This appeal and cross appeal, along with the companion cases decided today, *Branford* v. *Santa Barbara*, 294 Conn. 785, 988 A.2d 209 (2010), and *Branford* v. *Santa Barbara*, 294 Conn. 803, 988 A.2d 221 (2010), arise from the named defendant town of Branford's (town)[1] exercise of eminent domain with respect to an approximately seventy-seven acre parcel of land, known as 48-86 Tabor Drive. In this action

---

[1] The complaint originally named Anthony DaRos, Francis Walsh, Robert Denhardt, Jr., and Georgette Laske as defendants, but claims against those parties subsequently were withdrawn. In addition, Thomas Santa Barbara, Jr., and Frank Perrotti, Jr., were cited in as defendants and later filed a cross complaint against the town. For convenience, we refer to the parties by name rather than by party status.

brought pursuant to 42 U.S.C. § 1983 (§ 1983 action),[2] the town appeals[3] from the judgment rendered, following a jury trial, in favor of the cited in defendants, Thomas Santa Barbara, Jr., and Frank Perrotti, Jr., the owners of the subject property at the time of the taking (owners), and the plaintiff, New England Estates, LLC (New England Estates), a developer that had entered into an option contract with the owners to purchase the property.[4] The town claims that: (1) the trial court lacked subject matter jurisdiction because New England Estates and the owners failed to seek first a mandatory injunction for the return of the property, thus rendering their § 1983 action unripe; (2) the judgment in favor of New England Estates was improper because it did not have a compensable interest under the takings clause of the fifth amendment to the federal constitution; (3) because New England Estates and the owners already had recovered just compensation for the taking in their appeal challenging the statement of compensation filed by the town (valuation appeal); see *Branford* v. *Santa Barbara*, supra, 294 Conn. 785; the § 1983 action was barred by the doctrine prohibiting double recovery in general, and, more specifically, barred by the doctrines of res judicata and collateral estoppel, as well as the takings clause itself; (4) the takings clause protects only against takings that are not

---

[2] Title 42 of the United States Code, § 1983, provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any [s]tate . . . subjects, or causes to be subjected any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the [c]onstitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[3] The town appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] The trial court granted the motion by New England Estates to cite in the owners as necessary and indispensable parties. See General Statutes §§ 52-102 and 52-108; Practice Book § 9-6.

for a public use and provides no protection against takings that are based on pretext or constitute abuses of power; and (5) the trial court improperly awarded attorney's fees to New England Estates and the owners.[5] In their cross appeal, the owners claim that the trial court improperly denied them attorney's fees and costs in connection with the valuation appeal. We reverse the judgment in favor of New England Estates, and reverse the award of attorney's fees to New England Estates. We affirm the judgment in favor of the owners and affirm the award of attorney's fees to the owners for work performed in the § 1983 action. We reverse the denial of attorney's fees to the owners for work performed in connection with the valuation appeal, and remand the matter to the trial court for a determination of reasonable attorney's fees in connection with that case.

The jury reasonably could have found the following relevant facts. The owners purchased the subject property in 1991 at a foreclosure sale. The property was zoned as IG-2 industrial, with a small area designated as R-3 residential. The property also had an overlay zone designation as a special development area. In such an area, special development is allowed consistent with the unique characteristics of the land, when it is established that another zoning district could not be established to accomplish the proposed purpose of the development, and that the proposed use is consistent

---

[5] The town also claims that New England Estates failed to present sufficient evidence of lost profits. Because we conclude that New England Estates, as the holder of an unrecorded, unexercised option to purchase the property, does not hold a property interest protected by the takings clause, we need not address the town's claim that the award of lost profits to New England Estates was improper.

Additionally, because the town did not prevail in the valuation appeal; see Branford v. Santa Barbara, supra, 294 Conn. 789; we need not address its claim that if it had prevailed in the valuation appeal, the judgment in the § 1983 action should also be reversed.

with any comprehensive plan of development adopted by the planning and zoning commission (zoning commission) for the special development area. In 1988, the property previously also had been designated as a planned development district at the time of an approval of a plan for residential development of the land. The town's future land use plan designated the property for use as moderate to high-density residential.

From approximately 1985 through 1998, the owners operated the town's landfill, which abuts a portion of the property. Since 1991, the landfill has accepted only bulky waste; prior to that point, the landfill had also accepted solid waste. The owners contracted with Fuss and O'Neill, Inc. (Fuss & O'Neill), a consulting engineering company that specializes in, among other things, solid waste management, industrial and hazardous waste management, site plan engineering, environmental engineering, water resources engineering and environmental field services, to ensure that the landfill complied with the regulations and standards established by the state department of environmental protection (department). Fuss & O'Neill performed all required testing of the landfill on a quarterly basis, and prepared annual reports in connection with those assessments. During the fourteen years that the owners operated the landfill, Fuss & O'Neill reported no violations of the department's standards.

In 1988, Codespoti and Associates, P.C. (Codespoti), a landscape design firm, was retained by a prior owner of the property to prepare a site plan application for the residential development of the property. The plan, comprising 298 units and a golf course, was approved by the zoning commission that year. At that time, the town expressed no concerns regarding any potential environmental contamination of the property based on its proximity to the landfill, nor did the town indicate

that it had any interest in developing playing fields on the property. The plan was never developed.

In 2001, the owners entered into an option agreement with New England Estates, by which New England Estates agreed to make monthly payments to the owners for the exclusive option to purchase the property for $4.75 million which subsequently was increased by agreement to $4.85 million. Pursuant to the option agreement, New England Estates was responsible for obtaining all necessary permits for the development of the land. New England Estates retained Codespoti to prepare the site plan application for its planned development of the property. Codespoti worked from the plan he had developed in 1988, and made some modifications to it, including reducing the number of units per building from six to four, for a total of 268 units in the development, with a golf course as part of the development. In May, 2002, the town inland wetlands commission granted a five year permit to New England Estates for the proposed development on the property. In March, 2003, New England Estates obtained a permit from the United States Army Corps of Engineers, which was required due to the property's location near a tidal wetlands area. Those two permits represented the limit of New England Estates' success in obtaining approval for the development.

In November, 2002, the zoning commission denied approval for New England Estates' site plan application. In its notice of decision denying the permit, the zoning commission found that the proposed development did not satisfy the requisite standards for creating a new planned development district because the high density of the proposed development was inconsistent with surrounding neighborhoods, which are low and moderate density residential. The zoning commission also found that a multifamily zoning district could have accomplished the same proposed purpose, and further

expressed concerns regarding road access and flood control. The notice of decision expressed no concerns and made no findings regarding potential environmental contamination of the property from the landfill, nor did it indicate that the town had any interest in developing playing fields or establishing any other use on the property.

On June 18, 2003, New England Estates submitted a second site plan application, this time proposing an affordable housing development of 354 units.[6] In connection with the proposal, New England Estates requested a modification of its inland wetlands permit. Jeffrey Gordon, the president of Codespoti, testified that, with respect to wetlands impact, the only significant difference between the proposal that had received inland wetlands approval in May, 2002, and the June, 2003 proposal was that the June, 2003 proposal was designed in such a way that drainage from the development would have lesser impact on wetlands. Otherwise, the two plans had similar "footprints"; that is, the roadway, the number of buildings and bedrooms, the drainage, soil amendments, the utilities, and the phasing of construction would involve only minor changes, resulting in a slightly smaller "footprint" for the June, 2003 proposed development. The inland wetlands commission declined to grant the modification of the existing permit, and instructed New England Estates that it was required to submit an application for a new inland wetlands permit in connection with the development.

Internal communications among various town actors viewed in conjunction with the timing of the town's actions in response to New England Estates' proposals

[6] The application originally was submitted in May, 2003, but was modified and resubmitted in order to comply with requested changes by the inland wetlands commission.

revealed that the town was not receptive to an affordable housing development. In a memorandum dated October 22, 2002, Shirley Rasmussen, the town planner, informed the first selectman, Anthony DaRos, and Ellsworth McGuigan, of the zoning commission, of the possibility that New England Estates might submit an affordable housing proposal. The memorandum detailed relevant affordable housing statutes, discussed various strategies that had been implemented by the town with the purpose of "protecting the [t]own against affordable housing appeals" and suggested updating some town regulations to comply with state standards. On April 28, 2003, the owners informed Rasmussen that they soon would submit a site plan proposal for an affordable housing development. Rasmussen conveyed that information to DaRos. On May 21, 2003, the town board of selectmen voted unanimously to refer to the representative town meeting[7] a proposal to acquire the property—by eminent domain if necessary—in order to investigate and remediate environmental contamination and possibly to develop the property as playing fields. Shortly after the board of selectmen voted to refer the proposal to acquire the property to the representative town meeting, DaRos asked Stephen Dudley, the town engineer, to prepare a "sketch" of the property that depicted playing fields on the property.

On June 18, 2003, the administrative services committee of the town[8] (committee) met to consider whether to authorize the taking of the property. During that meeting, members of the committee represented that the town had a significant need for playing fields. Dud-

---

[7] The representative town meeting is the legislative body of the town and has the authority to take property by eminent domain. Any vote by the board of selectmen to seize land must be approved by the representative town meeting in order to have effect.

[8] The administrative services committee is a subcommittee of the representative town meeting. One of the functions of the administrative services committee is to gather information, and report back, regarding matters that have been delegated from the representative town meeting.

ley's sketch depicting playing fields on the land was displayed during the meeting and relied upon in discussion. In considering the second reason for the proposed acquisition of the land—environmental concerns due to the property's proximity to the landfill—the committee relied on a five page letter from Fuss & O'Neill to Rasmussen, dated April 16, 2003.[9] The committee did not rely on or refer to the fourteen years worth of annual reports that had been prepared by Fuss & O'Neill documenting their quarterly testing of the landfill and reporting no evidence of environmental contamination by department standards. The committee voted to recess and reconvene on the issue on July 2, 2003. In the meantime, the town board of finance met and recommended that the town appropriate $2.5 million for all associated costs related to the acquisition of the land, including legal fees.

Although both the June 18 and July 2, 2003 meetings of the administrative services committee were public hearings, neither New England Estates nor the owners were notified of the hearings. At the July 2, 2003 meeting, the committee heard testimony from David Hurley, a vice president of Fuss & O'Neill, who is also an environmental engineer and hydrogeologist. Hurley testified regarding the contents of the April 16 letter to Rasmussen, and stated that the information in the letter identified "generic" and "typical" concerns involved in building a residential development near a landfill. He stated before the committee that the information conveyed in the letter attested merely to "possibilities." He was not asked about a much more detailed and technical analysis of the landfill's environmental impact that Fuss & O'Neill had prepared in April, 2002, nor did

[9] At that time, Fuss & O'Neill had been retained by the town for engineering consulting services. David Hurley, a vice president of the company, testified that initial drafts of the letter had been submitted to the town's attorney for comment.

the committee members question him regarding the previous environmental testing that Fuss & O'Neill had performed on the landfill. At trial, Hurley testified that the town never had requested that he inspect or test the property prior to preparing his April 16 letter, or prior to his testimony before the committee on July 2, 2003.[10] At the end of the meeting, the committee unanimously voted to acquire the property and to present its recommendation to the representative town meeting. On July 9, 2003, relying on the recommendation of the committee and in light of the appropriation of funds by the board of finance, the representative town meeting convened and voted to take the land, either by way of negotiation or by eminent domain.

New England Estates subsequently initiated the § 1983 action by filing an application for a temporary injunction pursuant to 42 U.S.C. § 1983, alleging that the proposed condemnation by the town was undertaken in bad faith, and, accordingly, violated the takings clause of the fifth amendment of the constitution of the United States,[11] article first, § 11, of the constitution of Connecticut,[12] as well as provisions of the state and federal fair housing acts.[13] The owners were cited in as defendants

[10] In fact, at the subsequent July 9, 2003 meeting, Daniel Baughman, the chairman of the representative town meeting, represented that the town had been denied access to the property, despite the fact that New England Estates expressly had given the town permission to inspect it, and that permission never had been revoked.

[11] The fifth amendment to the United States constitution provides in relevant part: "[N]or shall private property be taken for public use, without just compensation."

[12] Article first, § 11, of the constitution of Connecticut provides: "The property of no person shall be taken for public use, without just compensation therefor."

[13] In the third amended complaint, which is the operative complaint, and in the third amended cross complaint, New England Estates and the owners, respectively, do not allege violations of the state constitution or provisions of the state and federal fair housing acts. The only cause of action brought to trial was the claim raised under 42 U.S.C. § 1983 that the condemnation constituted a wrongful taking in violation of the takings clause of the fifth amendment to the United States constitution.

in the action and filed a cross complaint against the town. On December 15, 2003, the court, *Hon. Anthony V. DeMayo*, judge trial referee, denied the application for a temporary injunction, concluding that New England Estates had failed to establish that: (1) it had no adequate legal remedy; (2) it would suffer irreparable injury; (3) it would likely succeed on the merits; and (4) the balancing of equities favored New England Estates. On December 18, 2003, the town filed a statement of compensation in the Superior Court, and on January 5, 2004, the town filed a certificate of taking. Both the owners and New England Estates appealed from the statement of compensation in separate actions, which subsequently were consolidated and tried together before the court in the valuation appeal. See *Branford* v. *Santa Barbara,* supra, 294 Conn. 792–93. Following the taking, New England Estates amended its complaint in the § 1983 action to seek only compensatory damages, removing the counts seeking injunctive relief. The valuation appeal and the § 1983 action subsequently were consolidated in the complex litigation docket in the judicial district of Waterbury, and then bifurcated into two separate phases.[14] After the court trial in the valuation appeal concluded, the § 1983 action went to trial before a jury, which found in favor of New England Estates and the owners, and awarded New England Estates $12,435,914, and the owners $340,000.[15]

---

[14] Although there are no written orders in the record reflecting either the consolidation or the subsequent bifurcation of the valuation appeal and the § 1983 action, in its memorandum of decision on the motions for attorney's fees, the trial court stated that it ordered both the consolidation and later bifurcation. The owners assert that the cases had been consolidated and the town does not challenge this assertion.

[15] Specifically, in special interrogatories, the jury found that New England Estates and the owners had proven by a preponderance of the evidence that the town's proffered reasons for taking the property were pretextual or invalid, unreasonable or an abuse of power, and, therefore that the condemnation violated the takings clause of the fifth amendment to the United States constitution. The jury also found that New England Estates had proven by a preponderance of the evidence that it suffered lost profits as a result of the taking in the amount of $11,243,876, and lost investment

The trial court denied the town's subsequent motions to set aside the verdicts and for judgment notwithstanding the verdicts, and for a new trial and remittitur. This appeal followed. Subsequent to the judgment rendered in accordance with the jury's verdict, and subsequent to the filing of this appeal, the trial court awarded attorney's fees pursuant to 42 U.S.C. § 1988.[16] In accordance with their separate submissions to the court in support of attorney's fees, the court awarded $1,488,587 in fees and costs to New England Estates and $275,979 in fees and costs to the owners. The town amended its appeal to challenge the award of attorney's fees, and the owners cross appealed.

I

We first address the town's claim that the court lacked subject matter jurisdiction over the § 1983 action because New England Estates and the owners failed to seek first a mandatory injunction for the return of the property, thus rendering the § 1983 action unripe for review. We conclude that the action was ripe for review.

In *Williamson Planning Commission* v. *Hamilton Bank*, 473 U.S. 172, 192, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985) (*Williamson*), the United States Supreme Court established a two part "finality requirement" for § 1983 actions that are premised on a claim that government regulations effect a taking of private property, entitling the property owner to just compensation under

---

expenses in the amount of $1,192,038. With respect to the owners, the jury found that they had proven by a preponderance of the evidence that as a result of the taking, they had suffered lost option payments under the option agreement with New England Estates in the amount of $90,000 and that they had suffered the loss of the full option contract price, in the amount of $250,000.

[16] Title 42 of the United States Code, § 1988 (b), provides in relevant part: "In any action or proceeding to enforce a provision of [section] . . . 1983 . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ."

the takings clause.[17] Such a claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue"; id., 186; and "the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the [s]tate for obtaining such compensation . . . ." Id., 195. The United States Court of Appeals for the Seventh Circuit succinctly has summarized *Williamson* as standing "for the proposition that there is no uncompensated taking—that is, nothing to litigate under 42 U.S.C. § 1983—until the state has established (a) what it has taken, and (b) its refusal to pay 'just compensation.' " *SGB Financial Services, Inc.* v. *Indianapolis-Marion County*, 235 F.3d 1036, 1038 (7th Cir. 2000).

The first prong of the test applies solely in the context of cases such as *Williamson* itself, in which the primary issue presented was whether there was a taking at all. *Williamson Planning Commission* v. *Hamilton Bank*, supra, 473 U.S. 185. This first portion of the *Williamson* inquiry "is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." Id., 193. As Judge Easterbrook explained in *SGB Financial Services, Inc.* v. *Indianap-*

---

[17] In setting forth the finality requirement, the court was careful to distinguish it from the requirement that a litigant exhaust state administrative remedies, which is not a prerequisite to bringing an action pursuant to § 1983. *Patsy* v. *Board of Regents of the State of Florida*, 457 U.S. 496, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982); see also *Fetterman* v. *University of Connecticut*, 192 Conn. 539, 549, 473 A.2d 1176 (1984) (*Patsy* rule finding no exhaustion requirement applies with equal force when § 1983 action brought in state court).

*olis-Marion County*, supra, 235 F.3d 1038, the first prong of *Williamson* requires that a property owner establish what the government has taken. Although that inquiry is often the primary issue in a regulatory takings case, in a case such as the present one, in which the town has physically taken the land, there is no question as to the extent of the taking. See *Southview Associates, Ltd.* v. *Bongartz*, 980 F.2d 84, 93 (2d Cir. 1992) (contrasting physical and regulatory takings). It is very clear what the town has taken; therefore, the first prong of *Williamson* is not applicable to the § 1983 action. See, e.g., *Montgomery* v. *Carter County*, 226 F.3d 758, 766 (6th Cir. 2000) ("[w]hen the state has physically occupied or invaded the plaintiff's property, there is generally no need to ask the relevant state decisionmaker to clarify its final position in order to determine whether a taking has occurred").

Moreover, the town's claim that New England Estates and the owners were required to seek a mandatory injunction ordering the return of the property so that the exact scope of the taking could be clarified is based on a misunderstanding of the first *Williamson* prong. A mandatory injunction, if granted, would constitute a judicial remedy for a violative action, not a final decision on the part of the town clarifying the scope of the taking. As we have stated, the extent of the taking is not in doubt. New England Estates and the owners were not required to seek such relief prior to bringing this § 1983 action.

Although the town did not rely on the second prong of the *Williamson* ripeness inquiry, we address it because it implicates subject matter jurisdiction. *Soracco* v. *Williams Scotsman, Inc.*, 292 Conn. 86, 91, 971 A.2d 1 (2009) ("concerns regarding subject matter jurisdiction implicate the court's fundamental authority and may properly be raised and decided by the court sua sponte"). Unlike the first prong of *Williamson*, the

requirement that a property owner seeking to bring an action pursuant to 42 U.S.C. § 1983 challenging a taking must first *unsuccessfully* seek just compensation through state proceedings does apply to physical takings. *Pascoag Reservoir & Dam, LLC* v. *Rhode Island*, 337 F.3d 87, 91 (1st Cir. 2003). As we explain in part III C of this opinion, however, the present case involves the highly unusual circumstance in which just compensation is not at issue. Instead, the issue is whether the town's condemnation of the land violated the constitutional rights of the owners and New England Estates because it did not comply with the public use requirement of the takings clause. Because the second prong of *Williamson* does not apply to a claim that a government actor's taking of private property violated the public use requirement, there is no jurisdictional bar to our consideration of the issue on appeal. See *Montgomery* v. *Carter County*, supra, 226 F.3d 766–67.

## II

We next address the town's claim that New England Estates' unrecorded, unexercised option to purchase the property is not an interest that is compensable under the takings clause of the fifth amendment. We conclude that, because such an interest is not considered a property interest under Connecticut state law, New England Estates' contractual right is not a property right protected by the federal takings clause.

The option contract between the owners and New England Estates granted to New England Estates the exclusive right to purchase the property. The initial term of the agreement was for six months, and New England Estates had the right to seek extensions of the agreement. The contract set a purchase price for the premises of $4.75 million.[18] The contract further required New England Estates to make monthly option

[18] The initial price of $4.75 million was later increased to $4.85 million.

payments to secure the option, initially at $10,000 per month, and increasing during renewal periods to $15,000 per month. One half of all the option payments was to be applied to the purchase price of the property. As part of the agreement, New England Estates was obligated to obtain the necessary permits and approvals to proceed with the planned development of the property. The contract granted to New England Estates the right to enter upon the premises for the purposes of inspecting and testing the property for any contamination, and as necessary in the pursuit of any permits and approvals for the development of the land. New England Estates agreed to purchase insurance to cover any risks associated with such entry upon the land. New England Estates did not record its option in the land records.

"The [f]ifth [a]mendment, made applicable to the [s]tates through the [f]ourteenth [a]mendment . . . provides that private property shall not be taken for public use, without just compensation. Because the [c]onstitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." (Citation omitted; internal quotation marks omitted.) *Phillips* v. *Washington Legal Foundation*, 524 U.S. 156, 163–64, 118 S. Ct. 1925, 141 L. Ed. 2d 174 (1998); see also *Board of Regents* v. *Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) ("Property interests, of course, are not created by the [c]onstitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."). Accordingly, we look to the laws of our state to determine whether New England Estates' right under the

option contract was a protected property interest under the takings clause.

This court already has concluded that an option contract conveys no property interest to an optionee. In *Patterson* v. *Farmington Street Railway Co.*, 76 Conn. 628, 634, 57 A. 853 (1904), the plaintiff entered into an option contract with the defendant, Coykendall, to purchase 135 out of a total of 315 mortgage bonds of the Hartford and West Hartford Horse Railroad Company. When the plaintiff tendered the agreed upon price for the bonds, Coykendall refused to convey them to him. Id., 633. Instead, Coykendall and two others, Soop and Greeley, purchased all the rights, property and franchises of the company, and formed the Farmington Street Railway Company to take over the property. Id. Upon the transfer, Coykendall, Soop and Greeley divided the stock of the new company among themselves. Id. The plaintiff brought an action seeking delivery of the original 135 bonds to him, or the transfer to him of a comparable share of the stock in the new company. Id. The court reasoned that the plaintiff's alleged equitable right to the stock depended on the legal effect of the option contract. The court then examined the nature of an option contract, which "affects for a limited time one right incident to absolute ownership, namely, the right to sell at pleasure, but does not otherwise affect the ownership." Id., 642. The limited rights conveyed under an option contract compelled the court's conclusion that "[s]uch a contract gives no property interest in its subject-matter."[19] Id. In Connecticut, therefore, under *Patterson*, an option contract does not

---

[19] New England Estates' rights under the option contract were further limited by a clause prohibiting it from assigning its rights under the agreement without the express written consent of the owners, unless the assignment were to an entity having the same principals as New England Estates itself.

create a property interest.[20] Applying that principle in the context of federal takings jurisprudence; see *Board of Regents* v. *Roth,* supra, 408 U.S. 577; New England Estates' unexercised option to purchase the land does not create a property interest that is protected under the taking clause.

New England Estates also contends that the permits that it had obtained created a property interest that was protected under the takings clause.[21] Any rights that New England Estates had pursuant to the permits, however, were tied to its rights under the option contract, which we already have concluded did not give rise to a property interest for purposes of the takings clause. New England Estates cites to federal authority for the proposition that a permit may give rise to a property interest protected under the takings clause, but all of those cases involved permits that had been obtained by the *owners* of the property in question. See, e.g., *A.A. Profiles, Inc.* v. *Fort Lauderdale,* 850 F.2d 1483, 1488 (11th Cir. 1988) (building permits obtained by

[20] New England Estates has not argued that we should overrule *Patterson,* and we decline to do so.

[21] The town suggests that, because the court did not instruct the jury that New England Estates had a protected property interest that arose from the permits that it had obtained, and because New England Estates does not now challenge the court's failure to so charge, New England Estates' claim that it had a protected property interest in the permits is not properly before this court. We disagree.

The question of whether New England Estates had a protected property interest is a question of law, not an issue decided by the jury. The court instructed the jury as follows: "I instruct you that as of January, 2004, when the town . . . took the seventy-seven acres by eminent domain, New England Estates had a constitutionally protected interest under the takings clause of the fifth amendment to the United States constitution in the property. That interest arose from the option agreement that it had with [the owners] to purchase the seventy-seven acre property." New England Estates took an exception to the charge, arguing that its property interest arose from the option contract and the permits, taken together. New England Estates' exception to the charge preserved its claim that, as a matter of law, the permits constituted a protected property interest.

property owner created compensable property interest), cert. denied, 490 U.S. 1020, 109 S. Ct. 1743, 104 L. Ed. 2d 180 (1989); *Wheeler* v. *Pleasant Grove*, 664 F.2d 99, 100 (5th Cir. 1981) (same), cert. denied, 456 U.S. 973, 102 S. Ct. 2236, 72 L. Ed. 2d 847 (1982). New England Estates has not cited to a single case in which a court concluded that an optionee, prior to exercising its rights under the option, held a compensable interest in permits that had issued in connection with the subject property.[22] We conclude, therefore, that New England Estates did not have a compensable property interest in the permits. Because our conclusion that New England Estates lacked a property interest protected under the takings clause renders the remaining issues irrelevant with respect to New England Estates, we address those claims only with respect to the owners.

## III

We next address the town's claims that the owners' recovery in the § 1983 action violated the rule of double recovery in general, and, more specifically, that the action was barred by the doctrines of collateral estoppel, res judicata and the takings clause itself, which the town contends prohibits separate recovery for the same taking under the just compensation and public use clauses.[23] We disagree.

---

[22] New England Estates cites to one case that involved a nonproperty owner's claim that he had a compensable interest in a permit. See *Scott* v. *Greenville County*, 716 F.2d 1409, 1421 (4th Cir. 1983). In *Scott*, however, the United States Court of Appeals for the Fourth Circuit concluded that the plaintiff, who held only an option to purchase the subject property, did not have a property interest in permits that he sought in connection with a proposed development of the land protected by the takings clause because the permits had not yet been issued to the plaintiff. Id., 1421–22. Accordingly, the court did not reach the issue of whether permits that had been issued to an optionee would constitute a protected property interest.

[23] Because the owners do not argue, in response to the town's claim that the § 1983 action is barred by the doctrines of collateral estoppel and res judicata, that the doctrines do not apply to bar the second phase of a bifurcated proceeding on the basis of a final judgment arrived at in the first phase, we do not address that issue.

The following additional procedural facts are necessary to the resolution of these claims. The jury awarded the owners $340,000 in damages based on the rights that the owners had pursuant to the option contract with New England Estates. Specifically, but for the condemnation of the property on January 5, 2004, the owners would have been entitled under the contract to receive $90,000 in option payments over the course of the next year. In addition, the full option contract price for the purchase of the property was $4.85 million.[24] During trial, one of the owners testified that the full option contract price would have entitled them to $250,000 more than they ultimately received for the condemnation of the property. The owners had been awarded $4.6 million as just compensation in the valuation appeal. See *Branford* v. *Santa Barbara*, supra, 294 Conn. 794. Thus, the jury awarded the owners the difference between the full option contract price and the amount recovered as just compensation, and $90,000 in additional option payments.

## A

We first address the town's claim that the § 1983 action was barred by the doctrine of collateral estoppel. Under Connecticut law, "[c]ollateral estoppel, or issue preclusion, prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment. . . . The doctrine of collateral estoppel is based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate." (Citations omitted; internal

---

[24] Although the original purchase price had been $4.75 million, that price later had been increased to $4.85 million by agreement of the parties.

quotation marks omitted.) *Aetna Casualty & Surety Co.* v. *Jones*, 220 Conn. 285, 296, 596 A.2d 414 (1991). "An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . 1 Restatement (Second), Judgments § 27, comment (d) (1982). An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." (Internal quotation marks omitted.) *Carol Management Corp.* v. *Board of Tax Review*, 228 Conn. 23, 32–33, 633 A.2d 1368 (1993). "In order for collateral estoppel to bar the relitigation of an issue in a later proceeding, the issue concerning which relitigation is sought to be estopped must be identical to the issue decided in the prior proceeding. . . . [T]he court must determine what facts were necessarily determined in the first trial, and must then assess whether the [party] is attempting to relitigate those facts in the second proceeding." (Internal quotation marks omitted.) *Aetna Casualty & Surety Co.* v. *Jones*, supra, 297. We must determine, therefore, whether the issues litigated in the § 1983 action are identical to any of the issues litigated and necessarily decided in the valuation appeal.

The valuation appeal arose from the separate appeals by New England Estates and the owners challenging the statement of compensation filed by the town in connection with the taking. *Branford* v. *Santa Barbara*, supra, 294 Conn. 792. Those appeals were consolidated and tried together in the complex litigation docket in the judicial district of Waterbury. The sole issue before the court was whether the town had paid just compensation for the property, and with respect to that issue, the primary dispute concerned whether the highest and best use of the land was residential, as New England Estates and the owners claimed, or, as the town contended, as undeveloped and vacant land. Id., 793. In

arguing that the highest and best use of the land could not be residential, the town relied primarily on the fact that the land was zoned as IG-2 industrial. Accordingly, both sides presented considerable testimony and evidence regarding New England Estates' attempts to obtain permits for residential development of the land, and the prior approval of the land for residential development. Id., 791–93. New England Estates and the owners presented the testimony of two appraisers who took as their starting point that the highest and best use of the land was residential and testified as to the value of the property based on relevant comparable sales of residential developments. Id., 793. The town's appraiser testified as to comparable sales on the basis of a starting assumption that the highest and best use for the property was as vacant and undeveloped land. Id., 793–94. On the basis of its finding that the highest and best use of the land was residential, the trial court relied on the testimony of the appraisers retained by New England Estates and the owners to arrive at its independent valuation of the property as $4.6 million. Id., 794.

Notably, the question of whether the taking was in any way wrongful or in violation of the public use requirement of the fifth amendment to the United States constitution was not at issue in the valuation appeal. The only issue litigated was the question of whether the town had offered just compensation for the land. By contrast, in the § 1983 action, the "value" of the property was not litigated in the trial court, nor is it at issue on appeal. Instead, the issue litigated in the § 1983 action is whether the town, by acting in bad faith in exercising its eminent domain power, violated the public use requirement of the taking clause. Although the finding of the trial court in the valuation appeal that the highest and best use of the land was residential was given preclusive effect in the § 1983 action; see footnote 30 of this opinion; that finding was relevant only insofar

as it pertained to whether the town acted in bad faith in denying approval for the residential development of the land. No appraisers testified in the § 1983 action as to the highest and best use of the land; no evidence of comparable sales was offered. It is true that testimony was offered regarding the efforts of New England Estates to obtain permits for the residential development of the land and that similar testimony was offered in the valuation appeal. In the valuation appeal, however, that testimony was offered as relevant to the claim of New England Estates and the owners that the highest and best use of the land was residential and, thus, that the fair market value of the land should be measured accordingly. See *Branford* v. *Santa Barbara*, supra, 294 Conn. 795–96. In the § 1983 action, by contrast, that testimony was elicited by New England Estates and the owners in order to establish that the town had acted in bad faith in taking the property by claiming that its reasons for the taking were to investigate and to remediate any environmental contamination on the property, and for the possible development of playing fields, when in fact the town's real purpose was to prevent the proposed residential development of the property.

Moreover, the damages recovered in the § 1983 action and the valuation appeal are not identical. The damages recovered in the valuation appeal were limited to the fair market value of the land, defined as "the price that would in all probability—the probability being based upon the evidence in the case—result from fair negotiations, where the seller is willing to sell and the buyer desires to buy." (Internal quotation marks omitted.) *Budney* v. *Ives*, 156 Conn. 83, 88, 239 A.2d 482 (1968); *Branford* v. *Santa Barbara*, supra, 294 Conn. 796. The damages sought and recovered in the § 1983 action essentially constituted consequential damages. New England Estates was awarded its lost profits; but see

part V A of this opinion; and the owners recovered their contract damages. These damages were not litigated or decided in the valuation appeal. The only element shared by the two issues is that both claims arose from the same set of events—namely, the town's taking of the land. That fact alone, however, is not sufficient to render these two issues identical. Although there was some overlap in evidence presented at both trials, the essential proof in each case was starkly different. Put simply, the valuation appeal required a showing that the compensation was inadequate; the § 1983 action required a showing that the town had been dishonest about its reasons for taking the land and had used a pretext to deprive the owners of the value of their bargain. The two issues are not even remotely identical. Accordingly, the § 1983 action is not barred by the doctrine of collateral estoppel.

## B

The town next claims that the § 1983 action is barred by the doctrine of res judicata. "The doctrine of res judicata holds that an existing final judgment rendered upon the merits without fraud or collusion, by a court of competent jurisdiction, is conclusive of causes of action and of facts or issues thereby litigated as to the parties and their privies in all other actions in the same or any other judicial tribunal of concurrent jurisdiction. . . . If the same cause of action is again sued on, the judgment is a bar with respect to any claims relating to the cause of action which were actually made or *which might have been made*." (Emphasis added; internal quotation marks omitted.) *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 600, 922 A.2d 1073 (2007). "The rule of claim preclusion prevents reassertion of the same claim regardless of what additional or different evidence or legal theories might be advanced in support of it." *Fink* v. *Golenbock*, 238 Conn. 183, 191, 680 A.2d 1243 (1996).

"We have adopted a transactional test as a guide to determining whether an action involves the same claim as an earlier action so as to trigger operation of the doctrine of res judicata. [T]he claim [that is] extinguished [by the judgment in the first action] includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a transaction, and what groupings constitute a series, are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. . . . In applying the transactional test, we compare the complaint in the second action with the pleadings and the judgment in the earlier action." (Citations omitted; internal quotation marks omitted.) *DeMilo & Co.* v. *Commissioner of Motor Vehicles*, 233 Conn. 281, 294, 659 A.2d 162 (1995).

"Finally, we recognize that a decision whether to apply the doctrine of res judicata to claims that have not actually been litigated should be made based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close . . . and the competing interest of the plaintiff in the vindication of a just claim. We have stated that res judicata should be applied as necessary to promote its underlying purposes. These purposes are generally identified as being (1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation. . . . The judicial [doctrine] of res judicata . . . [is] based on the public pol-

icy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate. . . . Stability in judgments grants to parties and others the certainty in the management of their affairs which results when a controversy is finally laid to rest. . . . We review the doctrine of res judicata to emphasize that its purposes must inform the decision to foreclose future litigation. The conservation of judicial resources is of paramount importance as our trial dockets are deluged with new cases daily. We further emphasize that where a party has fully and fairly litigated his claims, he may be barred from future actions on matters not raised in the prior proceeding." (Citation omitted; internal quotation marks omitted.) *Fink* v. *Golenbock*, supra, 238 Conn. 192–93.

Application of these principles to the present facts is not a simple matter. On the one hand, the valuation appeal and the § 1983 action are readily distinguishable. As we already have explained in our discussion of the town's collateral estoppel claim, these two actions raise different issues and seek different damages. See part III A of this opinion.

On the other hand, both actions arise from a single transaction: the taking of the property. The town's actions in denying the permits despite prior approval of a similar development, offering pretextual reasons for the taking in response to the affordable housing development proposal, bolstering the "evidence" supporting those pretextual reasons so shortly prior to the final vote to take the land, and in filing a statement of compensation consistent with its position that the highest and best use of the land was as vacant and undeveloped land, are very closely related in time, space, origin, and motivation. A straightforward application of the transactional test could yield the conclusion that res judicata bars the § 1983 action.

We cannot lose sight, however, of the fact that the doctrine of res judicata is driven by the principle of judicial economy, and not by the mechanistic application of the transactional test. That principle must be balanced with the policy of allowing a party to vindicate a just claim. We must therefore confine the application of res judicata to matters that the parties had an opportunity to litigate in the valuation appeal. The question remains whether the owners could have raised their § 1983 claim that the town wrongfully took the land in violation of the public use requirement of the fifth amendment, or sought the recovery of their contract damages in the valuation appeal.

General Statutes § 8-132 (b) (1) specifies the procedure to be followed in reviewing the statement of compensation as follows: "[T]he judge trial referee, after giving at least ten days' notice to the parties interested of the time and place of hearing, shall hear the applicant and the redevelopment agency, shall view the property and take such testimony as the judge trial referee deems material and *shall thereupon revise such statement of compensation* in such manner as the judge trial referee deems proper and promptly report to the court. Such report shall contain a detailed statement of findings by the judge trial referee sufficient to enable the court to determine the considerations upon which the judge trial referee's conclusions are based. The report of the judge trial referee shall take into account any evidence relevant to the fair market value of the property, including evidence of environmental condition and required environmental remediation. . . ." (Emphasis added.) The scope of an appeal pursuant to § 8-132, as stated in the statute, is whether, based on evidence relevant to fair market value, the statement of compensation should be revised. This reading of the statute is consistent with our case law. In interpreting the closely related statutory scheme governing the commissioner of trans-

portation's exercise of eminent domain in connection with the condemnation of land for state highway purposes, we repeatedly have articulated the limited scope of an appeal taken pursuant to General Statutes § 13a-76.[25] See, e.g., *St. John* v. *Commissioner of Transportation*, 172 Conn. 234, 240, 374 A.2d 190 (1977); *Plunske* v. *Wood*, 171 Conn. 280, 284, 370 A.2d 920 (1976). In *Plunske*, for example, we explained that the measure of damages for a partial taking for the purposes of highway construction is "the difference between the market value of the whole tract as it lay before the taking and the market value of what remained of it thereafter." (Internal quotation marks omitted.) *Plunske* v. *Wood*, supra, 283. Accordingly, we concluded that, although a court assessing damages for a partial taking must consider "any damage to the remainder [that] is a necessary, natural and proximate result of the taking,"

---

[25] General Statutes § 13a-76 provides in relevant part: "Any person claiming to be aggrieved by the assessment of such special damages or such special benefits by the commissioner may, at any time within six months after the same has been so filed, apply to the superior court for the judicial district within which such land is situated for a reassessment of such damages or such benefits so far as the same affect such applicant. The court, after causing notice of the pendency of such application to be given to the commissioner, may appoint a judge trial referee to make such reassessment of such damages or such benefits. The court or such judge trial referee, after giving at least ten days' notice to the parties interested of the time and place of hearing, shall hear the applicant and the commissioner, may view the land, and shall take such testimony as the court or such judge trial referee deems material and shall thereupon reassess such damages and benefits so far as they affect such applicant. The reassessment by the court or such judge trial referee shall take into account *any evidence relevant to the fair market value of the property,* including evidence of required environmental remediation by the Department of Transportation. The court or such judge trial referee shall make a separate finding for remediation costs, and the property owner shall be entitled to a set-off of such costs in any pending or subsequent legal action to recover remediation costs for the property. If the amount of the reassessment of such damages awarded to any such property owner exceeds the amount of the assessment of such damages by the commissioner for such land, the court or such judge trial referee shall award to such property owner such appraisal fees as the court or such judge trial referee determines to be reasonable. . . ." (Emphasis added.)

evidence of those damages is admissible only insofar as it is "evidence of elements in the decrease in market value," and any damages resulting from the negligence of a contractor working on the related highway improvements would not be recoverable in the condemnation proceeding, but must be sought in an independent action. (Internal quotation marks omitted.) Id., 284.

We relied on this line of cases to conclude, in *Albahary* v. *Bristol*, 276 Conn. 426, 436, 442, 886 A.2d 802 (2005), that a claim for inverse condemnation arising out of pretaking property damage caused by a condemnor may be raised in the context of an appeal seeking review of a statement of compensation pursuant to § 8-132. We reasoned that "[r]equiring separate proceedings would be both unnecessarily duplicative and inconsistent with our case law." Id., 442, citing *Plunske* v. *Wood*, supra, 171 Conn. 284–85. We distinguished a claim for inverse condemnation, which involves a determination of the compensation to which property owners are entitled, based on the value of property that is "taken" by virtue of government regulations or acts; *Albahary* v. *Bristol*, supra, 437 n.9; from actions that are grounded in personal liability, such as those sounding in tort. Id., 438–39. Damages sought as a result of the latter, we stated, would not be "recoverable in a condemnation proceeding, but must be sought in an independent action." Id., 438. This distinction is consistent with the language of § 8-132, setting forth the scope of review of a condemnation proceeding as limited to the court's review of the statement of compensation, on the basis of any evidence relevant to fair market value. General Statutes § 8-132 (b) (1); see also *Commissioner of Transportation* v. *Larobina*, 92 Conn. App. 15, 29, 882 A.2d 1265 (concluding that property owner may not, in context of valuation appeal taken pursuant to § 13a-76, challenge validity of condemnation), cert. denied, 276 Conn. 931, 889 A.2d 816 (2005).

Applying these principles to the present case, we conclude that, in the valuation appeal, the owners could not have raised their claim that the town wrongfully took the property in violation of the public use requirement of the takings clause. The owners' § 1983 action does not seek damages that are measurable with reference to the fair market value of the land, and they do not seek, by way of 42 U.S.C. § 1983, a review of the statement of compensation. Rather, as we previously have recognized, "the interests protected in a § 1983 action are similar to those protected in common law tort actions. In *Memphis Community School District v. Stachura*, 477 U.S. 299, 305, 106 S. Ct. 2537, 91 L. Ed. 2d 249 (1986), the United States Supreme Court stated that 42 U.S.C. § 1983 creates a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the [c]onstitution. . . . [T]he purpose of § 1983 damages is to compensate persons for actual injuries and the amount of compensation is ordinarily determined by the rules applicable to common law torts." (Citations omitted; internal quotation marks omitted.) *Virgo* v. *Lyons*, 209 Conn. 497, 502, 551 A.2d 1243 (1988). A claim alleging a civil rights violation pursuant to 42 U.S.C. § 1983 simply cannot be encompassed within the limited scope of review in a condemnation proceeding pursuant to § 8-132. In the valuation appeal, the owners could not have raised their claim that the town violated the public use requirement of the takings clause. Accordingly, we conclude that the § 1983 action is not barred by the doctrine of res judicata.

## C

The town claims that the takings clause itself prohibits the § 1983 action and advances two closely related arguments in support of this claim. First, it contends that just compensation is the only monetary remedy available for a violation of the takings clause and that

the sole remedy for a wrongful taking is injunctive relief barring the taking or ordering the return of the property. Put another way, the town claims that money damages are not recoverable under 42 U.S.C. § 1983 for a wrongful taking unless those damages constitute just compensation. Second, the town claims that, by pursuing the just compensation claim, the owners elected their remedy and waived any claim they may have had challenging the lawfulness of the taking. We disagree with both contentions.

We first address the town's claim that a property owner may not, pursuant to 42 U.S.C. § 1983, recover money damages for a wrongful taking when those money damages are not a part of just compensation. Because the United States Supreme Court has "declined . . . to classify § 1983 actions based on the nature of the underlying right asserted"; *Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 711, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999); we look to the nature of an action brought pursuant to 42 U.S.C. § 1983 in resolving this question. Title 42 of the United States Code, § 1983, provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any [s]tate . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the [c]onstitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." With regard to the general purpose of 42 U.S.C. § 1983, the United States Supreme Court has stated that it "was intended not only to 'override' discriminatory or otherwise unconstitutional state laws, and to provide a remedy for violations of civil rights 'where state law was inadequate,' but also to provide a federal remedy 'where the state remedy, though adequate in theory, was not available in practice.'" *Zinermon* v. *Burch*, 494 U.S.

113, 124, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990). Additionally, the court has stated that the remedy available pursuant to 42 U.S.C. § 1983 is "supplementary to any remedy any [s]tate might have . . . ." (Internal quotation marks omitted.) *Owens* v. *Okure*, 488 U.S. 235, 248, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989). Compensatory damages are allowable pursuant to 42 U.S.C. § 1983 upon proof of actual injury. *Carey* v. *Piphus*, 435 U.S. 247, 264, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978).

As we stated in part III B of this opinion, "the interests protected in a § 1983 action are similar to those protected in common law tort actions." *Virgo* v. *Lyons*, supra, 209 Conn. 502. The Supreme Court explained in *Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, supra, 526 U.S. 709, that "there can be no doubt that claims brought pursuant to [42 U.S.C.] § 1983 sound in tort. Just as common-law tort actions provide redress for interference with protected personal or property interests, [42 U.S.C.] § 1983 provides relief for invasions of rights protected under federal law." "Like other tort causes of action, it is designed to provide compensation for injuries arising from the violation of legal duties . . . and thereby, of course, to deter future violations." (Citation omitted.) Id., 727 (*Scalia, J.*, concurring); see also *Riverside* v. *Rivera*, 477 U.S. 561, 575, 106 S. Ct. 2686, 91 L. Ed. 2d 466 (1986) (recognizing that deterrence of future civil rights violations is proper purpose served by allowing recovery of money damages pursuant to 42 U.S.C. § 1983).

Applying these principles to the present case, it is evident that money damages are recoverable under 42 U.S.C. § 1983 for a violation of rights guaranteed by the constitution, and that the owners' recovery of damages in the present case serves the dual purpose of 42 U.S.C. § 1983 to provide redress for an invasion of a right protected under federal constitutional law, and to deter future violations of constitutional rights. The jury con-

cluded that the town violated the constitutional right of the owners to have their property taken only for a valid public purpose. The jury's finding satisfies the requirement of 42 U.S.C. § 1983 that there be an actual injury in order to justify an award of compensation. The money awarded in the § 1983 action was not a part of the just compensation due to the owners for the taking of the property. As we already have explained in this opinion, the award consisted of $90,000 in option payments that would have been due to the owners pursuant to their contract with New England Estates, and an additional $250,000, beyond the award of just compensation of $4.6 million in the valuation appeal, to which the owners would have been entitled under the contract had the taking never occurred. We acknowledge that the owners' recovery of what amounts to contract damages, above and beyond the fair market value of the land, is unusual. Ordinarily, as we already have stated in this opinion, the limit of a property owner's recovery is the fair market value of the land. *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 256 Conn. 813, 828, 776 A.2d 1068 (2001). The circumstances in the present case, however, justify a departure from the ordinary rule. As we explain more fully in part IV of this opinion, the town not only failed to provide just compensation, it also was dishonest about its reasons for taking the land. It is upon that second violation of the takings clause that the owners based their § 1983 action.

Additionally, allowing the recovery of damages under 42 U.S.C. § 1983 is consistent with the general principle that the focus in evaluating the measure of compensation due to a property owner under the takings clause is on "what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce* v. *Boston*, 217 U.S. 189, 195, 30 S. Ct. 459, 54 L. Ed. 725 (1910).[26] There-

---

[26] But see part III B of this opinion discussing the limited scope of a valuation appeal.

fore, the owner "is entitled to be put in as good a position pecuniarily as if his property had not been taken." (Internal quotation marks omitted.) *Brown* v. *Legal Foundation of Washington,* 538 U.S. 216, 236, 123 S. Ct. 1406, 155 L. Ed. 2d 376 (2003). The owners and New England Estates had sought, and were denied, injunctive relief barring the town from taking the land. The town makes much of the fact that, once the town had taken the land, the owners and New England Estates did not seek injunctive relief ordering its return, and instead sought money damages. Once the town took the land, however, the owners' rights under the contract were extinguished, and the return of the land could not restore those contract rights, and, thus, could not have placed the owners in as good a position pecuniarily as if their property had not been taken. Id.

We next address the town's contention that the owners waived their right to challenge the wrongfulness of the taking by pursuing their claim for just compensation. The town appears to rely on the basic principle that a property owner may not both receive just compensation for a taking and pursue injunctive relief seeking to bar the taking or, if the taking already has been accomplished, seeking the return of the land. Put simply, the town claims that a property owner may not have its just compensation and its property too. Obviously, the granting of injunctive relief would obviate the need for just compensation, and an award of just compensation followed by a return of the property would constitute a particularly striking example of double recovery. That is not, however, what occurred in the present case. The owners did not seek the return of the land after they had recovered just compensation—they sought damages for the town's bad faith actions in taking the land. Additionally, as we already have explained, the damages recovered in the § 1983 action were not a part of just compensation. Therefore,

the strong disjunction relied upon by the town—either just compensation or injunctive relief, but not both— is inapplicable to these facts. The damages recovered by the owners in the § 1983 action simply are not duplicative of the just compensation awarded in the valuation appeal. They are additional damages recovered on the basis of the town's bad faith actions in accomplishing the taking.

## IV

The town next argues that the public use clause prohibits only a taking of private property for a use that is not a public use and does not provide a remedy for a taking that is undertaken in bad faith, or one that constitutes an abuse of power.[27] The town does not

[27] The town also argues that the trial court improperly instructed the jury that, in order to prevail, New England Estates and the owners must have proven with respect to each of the elements of the § 1983 claim that: "*either* (1) the town's stated reason was pretextual and its actual reason was invalid; *or* (2) the town acted unreasonably; *or* (3) the town abused its power." (Emphasis added.) The town claims that a taking that is unreasonable or an abuse of power does not violate the takings clause. The charge and a corresponding interrogatory both state clearly, however, that any *one* of the three findings would be sufficient to justify a finding by the jury that the town violated the takings clause. As we explain in this part of the opinion, a pretextual or bad faith taking violates the takings clause. A jury finding on this basis, therefore, would support the verdict in favor of New England Estates and the owners. Moreover, the town does not claim on appeal that there was insufficient evidence to justify the jury's finding that it acted in bad faith. Accordingly, the jury properly could have based its finding that the town's actions violated the takings clause on a finding that the town's proffered reasons for the taking were pretextual. "[I]f a jury renders a general verdict for one party, and no party requests interrogatories, [it is presumed] that the jury found every issue in favor of the prevailing party. . . . Thus, in a case in which the general verdict rule operates, if any ground for the verdict is proper, the verdict must stand; only if every ground is improper does the verdict fall. . . . The rule rests on the policy of the conservation of judicial resources, at both the appellate and trial levels." (Internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 115 n.47, 952 A.2d 1 (2008). Under the general verdict rule, therefore, any error with respect to the court's instruction that the jury could, in the alternative, base its decision on a finding of abuse of power or unreasonableness is harmless, and it is unnecessary to address the town's claim that those portions of the charge were improper. *State* v. *Ross*, 230 Conn. 183, 215, 646 A.2d 1318 (1994) (unnecessary to address merits of defendant's challenge to jury instruction because any error was harmless), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).

The town also claims that the court improperly instructed the jury in the introductory portion of the charge on eminent domain that the "town's use

challenge the jury's finding that in taking the land, the town either acted in bad faith, taking the land for pretextual reasons, acted unreasonably, or in an abuse of its power—instead, it argues that it did not violate the public use requirement by being dishonest about the reasons for which it took the land. It is well established, however, that a government actor's bad faith exercise of the power of eminent domain is a violation of the takings clause. *Essex Fells* v. *Kessler Institute for Rehabilitation, Inc.*, 289 N.J. Super. 329, 337, 673 A.2d 856 (1995), and cases cited therein. Thus, there is no merit to the town's claim that a violation of the public use requirement is limited to situations in which the government takes private property for a use that is not a public use. Although the United States Supreme Court has not yet addressed this issue directly, we agree with those jurisdictions concluding that the public use clause should not be interpreted so narrowly. Indeed, many state courts have found a violation of the takings clause on the basis of a bad faith exercise of the power of eminent domain. See, e.g., *Carroll County* v. *Bremen*, 256 Ga. 281, 282–83, 347 S.E.2d 598 (1986) (bad faith taking to prevent construction of water waste facility exceeded county's eminent domain power); *Pheasant Ridge Associates Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 774–75, 506 N.E.2d 1152 (1987) (town's bad faith taking of private property to prevent affordable housing development unlawful and void); *Essex Fells* v. *Kessler Institute for Rehabilitation, Inc.*, supra, 339 (dismissing borough's complaint in condemnation because state public use was pretext); *In re Hewlett Bay Park*, 48 Misc. 2d 833, 837, 265 N.Y.S.2d 1006 (1966) (dismissing condemnation proceeding based on finding that village offered pretextual, bad faith reason for taking).[28]

of eminent domain must follow a plan in which the land is taken for public use, public purpose, or public benefit." The town makes the unsupported assertion that the court's use of the word "plan" in this general language attempted to import requirements from the urban renewal statutes into eminent domain law. That argument mischaracterizes the charge and we do not address it.

[28] The town's reliance on *Kelo* v. *New London*, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005), for the proposition that only a taking for the

## V

Finally, we address the town's challenge to the award of attorney's fees, and the owners' claim in their cross appeal that the trial court improperly declined to award them attorney's fees pursuant to 42 U.S.C. § 1988 in connection with work performed in the valuation appeal. See footnote 16 of this opinion. The following additional procedural facts are relevant to the resolution of these claims. Following the judgment rendered in favor of New England Estates and the owners in accordance with the verdict, the trial court awarded attorney's fees to both of those parties. The trial court awarded New England Estates $1,488,587, which included an award for attorney's fees for work performed in connection with the valuation appeal. The court's award of $275,979 to the owners did not include an award for fees in connection with the valuation appeal.

## A

We first address the town's claim that, because only a prevailing party may recover attorney's fees pursuant to 42 U.S.C. § 1988, if the town prevails on the merits in this appeal, the attorney's fees fail as well.[29] We agree, but because the town prevailed only against New England Estates, the award of attorney's fees is reversed only with respect to those fees awarded to New England Estates; the award of attorney's fees to the owners does not fail.

Section 1988 of title 42 of the United States Code clearly authorizes the award of attorney's fees only to

purpose of conferring a benefit on a private party constitutes a violation of the public use requirement, interprets that decision overbroadly. *Kelo* did not involve any allegations that the city of New London acted in bad faith in taking private property. Id., 478. Therefore, the issue of whether a bad faith taking would violate the public use requirement was not before the court.

[29] The town also appears to argue in its brief that even if it prevails only against New England Estates, and not with respect to the owners, that result not only means that New England Estates is not a "prevailing party" for purposes of 42 U.S.C. § 1988, but the *owners* also are no longer prevailing parties, and the town is entitled either to judgment or to a new trial. The town has offered no support for this extraordinary claim, and we do not address it.

a "prevailing party . . . ." See footnote 16 of this opinion. The relevant question, therefore, is whether New England Estates and the owners are prevailing parties for purposes of 42 U.S.C. § 1988. The United States Supreme Court has explained that "[u]nder our generous formulation of the term, plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." (Internal quotation marks omitted.) *Farrar* v. *Hobby*, 506 U.S. 103, 109, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992). Under that rule, we conclude that New England Estates has not prevailed on a significant issue. We have concluded in this opinion that, pursuant to Connecticut law, New England Estates did not have a compensable property interest protected by the takings clause. See part II of this opinion. That conclusion yields the result that New England Estates has recovered no damages in this action. New England Estates clearly is not a prevailing party. The owners, on the other hand, have prevailed. We have affirmed the judgment rendered following the jury verdict in favor of the owners, and upheld that judgment in face of all of the arguments of the town advanced against it. See parts III and IV of this opinion. Accordingly, the award of attorney's fees to New England Estates is reversed, and the order of attorney's fees to the owners is affirmed.

B

In their cross appeal, the owners claim that the trial court improperly declined to award them fees in connection with work performed in the valuation appeal. The owners appear to advance two separate theories in support of this claim. The first theory upon which they apparently rely is that the fees expended for the valuation appeal are recoverable pursuant to 42 U.S.C. § 1988 because that action was a prior proceeding that involved work that was both necessary and useful for its success in its § 1983 action. The second theory takes as its starting point the fact that the valuation appeal and the § 1983 actions had been consolidated and later

were bifurcated. See footnote 14 of this opinion. Under that theory, the owners contend, they should have been awarded fees for the work done on the valuation appeal, which was merely the first phase of these consolidated actions, because the work done on those claims was sufficiently related to their successful § 1983 claims. We conclude that the owners are entitled to reasonable attorney's fees under their second theory. Because a prevailing plaintiff in an action brought pursuant to 42 U.S.C. § 1983 "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust," our review of the trial court's decision not to award attorney's fees to the owners is plenary. *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S. Ct. 964, 19 L. Ed. 2d 1263 (1968).

To illustrate why the second theory more appropriately applies under these procedural facts, it is helpful first to set forth the two theories in greater detail. Under the first theory, the owners contend that the valuation appeal constituted a related prior proceeding under *Webb* v. *Board of Education*, 471 U.S. 234, 242, 105 S. Ct. 1923, 85 L. Ed. 2d 233 (1985). *Webb* involved a § 1983 plaintiff who sought recovery for attorney's fees in prior administrative proceedings. Both the administrative proceedings and the § 1983 action challenged the plaintiff's termination of employment as a public school teacher. Id., 236. The court concluded that fees for the administrative proceeding were not recoverable; id., 243; and articulated the following rule for determining when fees are recoverable for a prior proceeding. First, "[t]he time that is compensable under § 1988 is that reasonably expended *on the litigation.*" (Emphasis in original; internal quotation marks omitted.) Id., 242. Some services rendered during the course of a prior proceeding, however, "are performed 'on the litigation.' " Id., 243. In order for work performed during a prior proceeding to be considered " 'on the litigation' " for purposes of § 1988, it must be "work that was both useful and of a type ordinarily necessary to advance the civil rights litigation" to the final result. Id.

The second theory relied upon by the owners views the valuation appeal not as an underlying, prior proceeding, but as the first part of a single litigation. There are several lines of cases dealing with this question, and the most relevant are those that address the question of whether a plaintiff may recover fees in an action brought pursuant to 42 U.S.C. § 1983 for work performed on a claim for which a fee is not independently recoverable—a non-fee claim. Ordinarily, this question arises when a litigant prevails in an action brought pursuant to 42 U.S.C. § 1983, but does so on the non-fee claim, and the claim brought pursuant to 42 U.S.C. § 1983 is left unaddressed by the court. See, e.g., *Smith* v. *Robinson*, 468 U.S. 992, 1006–1007, 104 S. Ct. 3457, 82 L. Ed. 2d 746 (1984), superseded by statute as stated in *Pazik* v. *Gateway Regional School District*, 130 F. Sup. 2d 217 (D. Mass. 2001). In *Maher* v. *Gagne*, 448 U.S. 122, 132 n.15, 100 S. Ct. 2570, 65 L. Ed. 2d 653 (1980), the court explained that the legislative history of 42 U.S.C. § 1988 "makes it clear that Congress intended fees to be awarded where a pendent constitutional claim is involved, even if the statutory claim on which the plaintiff prevailed is one for which fees cannot be awarded . . . ." "In some instances . . . the claim with fees may involve a constitutional question which the courts are reluctant to resolve if the non-constitutional claim is dispositive. . . . In such cases, if the claim for which fees may be awarded meets the substantiality test . . . attorney's fees may be allowed even though the court declines to enter judgment for the plaintiff on that claim, so long as the plaintiff prevails on the non-fee claim arising out of a common nucleus of operative fact." (Citations omitted; internal quotation marks omitted.) Id., 133 n.15. The court earlier had stated, in *Smith* v. *Robinson*, supra, 1007, the additional requirement that "a claim for which fees are awarded [must] be reasonably related to the plaintiff's ultimate success." The United States District Court for the Northern District of New York summarized the two holdings: "When a plaintiff prevails upon a non-§ 1983 claim

which is accompanied by an undecided § 1983 claim, a fee award pursuant to § 1988 is appropriate where (1) the § 1983 claim is sufficiently substantial to support the invocation of federal jurisdiction; (2) it arises from the same nucleus of operative facts as the claim on which the plaintiff prevailed; and (3) it is reasonably related to the plaintiff's ultimate success." (Internal quotation marks omitted.) *American Automobile Manufacturers Assn.* v. *Cahill,* 53 F. Sup. 2d 174, 179–80 (N.D.N.Y. 1999). Recovery for a successful, non-fee claim also has been held to be allowable where the reasonably related, substantial, § 1983 claim has been "reached and upheld . . . ." *Raley* v. *Fraser,* 747 F.2d 287, 292 (5th Cir. 1984).

Because the valuation appeal and the § 1983 action were consolidated and then bifurcated for purposes of trial, the present case is more appropriately understood, for purposes of this issue, as a single action, in which the owners have prevailed both on a non-fee claim, seeking just compensation for the taking, and their § 1983 claim, seeking damages for the bad faith actions of the town in accomplishing the taking. Accordingly, the rule set forth in *Smith* and *Maher* applies.

Applying that rule, we first turn to the question of substantiality. The Supreme Court set forth the "substantiality" test in *Hagans* v. *Lavine,* 415 U.S. 528, 554, 94 S. Ct. 1372, 39 L. Ed. 2d 577 (1974). The test requires a plaintiff to allege constitutional violations sufficiently substantial to support federal jurisdiction. *Maher* v. *Gagne,* supra, 448 U.S. 130–31. Because we have concluded that the town violated the takings clause of the fifth amendment by acting in bad faith in taking the owners' property, the § 1983 claim is sufficiently substantial to support federal jurisdiction.

We also conclude that the owners' just compensation claim and their bad faith claim arose from a common nucleus of operative facts. Although the cases involved separate issues, both required discovery and proof regarding environmental contamination, which was rel-

evant to the trial court's determination of whether to offset the fair market value of the land by any costs for remediation, and relevant in the § 1983 action to support the owners' claim that the town had been dishonest when it asserted that one of its reasons for the taking was to investigate and remediate environmental contamination. Similarly, the history of the various permitting approvals and denials was relevant in the valuation appeal to demonstrate that the highest and best use of the property was residential, and it was relevant in the § 1983 action as evidence of the town's bad faith in denying approval of the affordable housing proposal.[30] Finally, the fair market value of the land itself, the ultimate factual determination of the trial court in the valuation appeal, was highly relevant to the § 1983 action. In the § 1983 action, the owners sought contract damages above and beyond what they had recovered in the valuation appeal. Accordingly, without the determination of the fair market value of the property in the valuation appeal, the jury could not have arrived at an amount of contract damages to award to the owners in the § 1983 action.[31]

Finally, the § 1983 action is reasonably related to the owners' success. It is undisputed that the contract damages recovered in the § 1983 action would not have been recoverable in the valuation appeal. Therefore, to the extent that, at the end of this litigation, the owners

---

[30] The court instructed the jury that the court's determination in the valuation appeal that the highest and best use of the property was for residential development was to be given preclusive effect in the present case, and further instructed the jury that it was reasonably probable that, but for the taking, New England Estates would have obtained the required approvals to develop the land according to its proposed, 354 unit affordable housing development. These facts were relevant to the jury's determination that the town acted in bad faith in blocking the development.

[31] The town contends that the conclusion that these two cases arise out of a common nucleus of operative facts is inconsistent with the conclusion that the action is not barred by the doctrine of res judicata. As we already have explained in this particular case, the transactional test is not helpful. Rather, in our analysis of the doctrine of res judicata as it applies to the present case, we have focused on the fact that the § 1983 claim could not have been raised in the valuation appeal. See part III C of this opinion. Moreover, although there is no written record of the trial court's reasons for bifurcating these two actions, it is likely that the court bifurcated them precisely because it had determined that the limited scope of a valuation appeal precluded the two actions from being tried together.

were placed in as good a position as they would have been had the taking never occurred, the § 1983 action was essential to achieving that end. Accordingly, we conclude that the owners are entitled to attorney's fees for work reasonably expended in the valuation appeal. The case is remanded to the trial court for a determination of what fees are reasonable for that claim.

The judgment in favor of New England Estates and the award of attorney's fees to New England Estates are reversed. The judgment in favor of the owners and the award of attorney's fees to the owners for work performed in the § 1983 action are affirmed. The denial of attorney's fees to the owners for work performed in the valuation appeal is reversed and the case is remanded to the trial court for a determination of reasonable attorney's fees in connection with that case.

In this opinion the other justices concurred.